IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ATLANTIC CITY ELECTRIC COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.04–0036C |
| v. | ) | (Judge George Miller) |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Defendant, the United States, respectfully submits this reply to "Plaintiff Atlantic City Electric Company's Brief In Opposition To Defendant's Motion To Dismiss, " dated August 6, 2004.

SUMMARY OF ARGUMENT

In this case, plaintiff, Atlantic City Electric Company ("Atlantic"), claiming to be a former minority interest owner of the Hope Creek, Salem, and Peach Bottom nuclear reactors, has intentionally and purposely elected not to assert a claim for damages under a breach of contract theory. Instead, its only identified basis of liability is for a taking of its property under the Fifth Amendment to the United States Constitution – specifically, the diminished value of its minority ownership interest and, apparently, its portion of fees paid into the Nuclear Waste Fund ("NWF"). These alleged damages purportedly were caused by the Department of Energy's failure to begin accepting spent nuclear fuel ("SNF") and/or high-level radioactive waste ("HLW") from the nuclear utility industry by January 31, 1998.

Unfortunately for Atlantic, the Department of Energy ("DOE") had to begin SNF and/or HLW acceptance by January 31, 1998, only pursuant to standardized contracts, the "Standard

Contract For Disposal Of Spent Nuclear Fuel And/Or High-Level Radioactive Waste" ("Standard Contract"), 10 C.F.R. § 961.11, into which DOE entered with various nuclear utilities. Atlantic cannot assert a takings claim predicated upon DOE's breach of the Standard Contract. Apparently recognizing that fact, Atlantic has attempted to withdraw its reliance upon the Standard Contract, now contending that it has a vested property interest as a result of a "long-standing Government undertaking that culminated in the NWPA, rights and interests that exist independently from the Standard Contract." Pl. Opp. 7.[1] However, none of the statutes or the regulation that Atlantic cites create any obligation upon DOE to accept SNF and/or HLW from any particular entity by any particular date, absent that entity's execution of a contract with DOE. Accordingly, Atlantic has no basis for maintaining a takings action for DOE's failure to begin accepting that SNF by January 31, 1998.

Atlantic also asserts that the alleged over-collection of fees by the Secretary of Energy into the NWF constitutes a taking of its property. Again, those fees are required to be paid only pursuant to contract, and, in fact, Atlantic itself, given that it was not the "Purchaser" in the Standard Contracts at issue, was not required to pay those fees. Because its fee payment takings claim is contract-based, and because any fee payments that Atlantic may have voluntarily made on the Purchaser's behalf were not compelled by the Government, its allegations regarding fee payments do not create a viable takings claim. In any event, pursuant to statute, the United States Courts of Appeals have original and exclusive jurisdiction to consider challenges to the Secretary's decisions regarding whether to petition Congress to modify the statutory fee amount,

[1] "Pl. Opp. __" refers to plaintiff's brief in opposition to our motion to dismiss plaintiff's complaint. "Compl. ¶ __" refers to plaintiff's complaint in this action.

precluding this Court's consideration of that issue. Accordingly, its complaint should be dismissed.

## DISCUSSION

### I. ATLANTIC'S ASSERTIONS THAT ITS TAKINGS CLAIM IS BASED UPON RIGHTS PRE-EXISTING THE STANDARD CONTRACT OR ARISING OUTSIDE OF THE STANDARD CONTRACT ARE UNSUPPORTABLE

#### A. Atlantic's Contention That The Atomic Energy Act, 10 C.F.R. Part 50, And The NWPA Created Federal Obligations To Accept Commercial Nuclear Reactor SNF That Give Rise To "Property" Rights Lacks Merit

In our motion to dismiss Atlantic's complaint, we demonstrated that the Government had no obligation to accept spent nuclear fuel ("SNF") and/or high-level radioactive waste ("HLW") from the Hope Creek, Peach Bottom, or Salem reactors – in which Atlantic claims to have had a minority ownership interest – prior to the execution of the Standard Contracts applicable to those facilities. Def. Br. 1-3. In response, Atlantic has attempted to recast its claim as arising outside of the Standard Contract. See, e.g., Pl. Opp. 2 n.1, 3, & 7. Atlantic argues that, "[c]ontrary to the Government's assertion, Atlantic's takings claim arises from property rights and interests that emanate from a long-standing Government undertaking that culminated in the NWPA, rights and interests that exist independently from the Standard Contract." Id. at 7. Atlantic now asserts that its takings claim "is not predicated on rights emanating from the Standard Contract, but rather . . . upon legal and property rights recognized by Congress and affirmed by numerous courts long before the drafting of the Standard Contract." Pl. Opp. 8.[2]

[2] Atlantic's revisionist assessment of its claim is contradicted by the unambiguous allegations in its complaint. In our motion to dismiss, we quoted liberally from Atlantic's complaint, and our motion was based entirely upon the express allegations contained in Count I of the complaint. See Def. Br. 4-5. Significantly, in the eight paragraphs that make up Count I, Atlantic references the NWPA six times and the Standard Contract five times. See Compl.

Even assuming that Atlantic's new allegations were true, they would not provide a basis for a takings claim. "In analyzing a takings claim, a court must first determine what [property right] was taken." Branch v. United States, 69 F.3d 1571, 1575 (Fed. Cir. 1995). The Supreme Court has been clear that a "mere unilateral expectation or an abstract need is not a property interest entitled to protection" under the Fifth Amendment, Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980), "even if they are entirely plausible expectations of economic benefit." National Educ. Ass'n-R.I. v. Retirement Bd., 172 F.3d 22, 29 (1st Cir. 1999).

To the extent that a statute or regulation provided that the Government would accept SNF from nuclear reactors, no entity would have had a property right in that rule of law. "[T]he law itself, as a rule of conduct, may be changed at the will or even the whim, of the legislature, unless prevented by constitutional limitations." Fern v. United States, 908 F.2d 955, 959 (Fed. Cir. 1990) (quoting Munn v. Illinois, 94 U.S. 113 (1876)); see Branch, 69 F.3d at 1577-78 ("[i]If every time a man relied on existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever'") (quoting L. Fuller, The Morality of Law 60 (1964)); Pittman v. Chicago Bd. of Educ., 64 F.3d at 1104-05 ("A statute is not a commitment by the legislature never to repeal the statute. . . . Statutes would be ratchets, creating rights that could never be retracted or even modified without buying off the groups upon which the rights had been conferred"). "Because Congress has the right to modify

---

¶¶ 56-63. Count I lacks any reference to a "long standing Government undertaking" or to any other statute or regulation. Atlantic's claim, as pled in its complaint, is founded upon the NWPA and the Standard Contract, and the "property right" allegedly taken by the Government is Atlantic's "right" to have DOE begin acceptance of SNF generated by the utilities by January 31, 1998. See, e.g., Compl. at ¶¶ 57-58, 60. Atlantic cannot amend its complaint through its response brief. Shanahan v. Chicago, 82 F.3d 776, 781 (7th Cir. 1996).

or terminate a federal program, the benefits of such a program do not constitute a property interest protected by the Fifth Amendment." Members of the Peanut Quota Holders Ass'n, Inc. v. United States, 60 Fed. Cl. 524, 529 (2004). To the extent that Atlantic is relying upon a statute or regulation as creating a right to SNF acceptance, it cannot state a viable takings claim by identifying that statute or regulation as its "property right" to require that acceptance.

B. Atlantic's Contention That The Atomic Energy Act And 10 C.F.R. Part 50 Created Federal Obligations To Accept Commercial Nuclear Reactor SNF Prior To The Execution Of The Standard Contract Lacks Merit

Even assuming that a statute or regulation could constitute a "property right" upon which a takings claim could be based, Atlantic's alleged "right" does not exist. To support its new assertions regarding pre-NWPA rights to SNF acceptance, Atlantic cites to a May 1981 Congressional Budget Office Staff Working Paper and argues that, prior to the enactment of the NWPA, "the federal government ha[d] recognized its sovereign obligation to provide for the lawful and permanent disposal of the wastes of nuclear power generation." Id. at 8. Atlantic also cites to 10 C.F.R. Part 50 for the proposition that "an official Government policy" that "long-predates the NWPA" required that disposal of SNF occur on land owned and controlled by the Federal Government. Id. at 9. Tellingly, Atlantic does not refer to any language in either the Atomic Energy Act of 1954, 42 U.S.C. §§ 2011-2297g-4, or 10 C.F.R. Part 50 obligating the Government to dispose of SNF generated by commercial utilities by a date certain or without compensation from commercial utilities. In fact, other than through its reference to a CBO Staff Working Paper, Atlantic cites nothing to support its contention that the Government, before it entered into contracts with nuclear utilities in accordance with the provisions of the NWPA, had

ever assumed an unconditional obligation to accept commercial nuclear utilities' SNF or to accept it by any particular date. In fact, no such obligation existed.

The Atomic Energy Act ("AEA") authorized private ownership of nuclear reactors to promote the development of atomic energy. See Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1330 (Fed. Cir. 2001) (stating that the AEA "for the first time authorized private ownership of nuclear power reactors"); United States v. Commonwealth of Kentucky, 252 F.3d 816, 821 (6th Cir. 2001) ("Congress enacted the [AEA] in 1954 to promote the development of atomic energy for peaceful purposes under a program of federal regulation and licensing."). In Nuclear Energy Inst., Inc. v. Envtl. Prot. Agency, 373 F.3d 1251, 1286-89 (D.C. Cir. 2004), the District of Columbia Circuit recently held that the NRC's promulgation of licensing criteria governing disposal of civilian radioactive waste was "under the NWPA," despite the statute's reference to the NRC's authority to promulgate such licensing criteria under "other provisions of law," namely, the AEA of 1954 and the Energy Reorganization Act of 1974. Id. at 1286-89; see also id. at 1258 ("In 1982, responding to growing quantities of radioactive waste and their potentially deadly health risks, Congress enacted the Nuclear Waste Policy Act, directing the federal government to assume responsibility for permanently disposing of the nation's nuclear waste."). The AEA did not, in and of itself, obligate the Federal Government to accept commercial utilities' SNF, to accept that SNF by any particular date, or to accept that SNF without compensation. Accordingly, Atlantic cannot establish any obligation arising out of the AEA that could form the basis of a takings claim.

Atlantic's citation to 10 C.F.R. Part 50, Appendix F, for the proposition that, as of 1970, the NRC had precluded "[d]isposal of high-level radioactive fission product waste" on land not

"owned and controlled by the Federal Government," Pl. Opp. at 8-9, is equally misplaced. Appendix F of 10 C.F.R. Part 50, which was first promulgated in 1970, relates to the "Policy Relating To The Siting Of Fuel Reprocessing Plants And Related Waste Management Facilities." 10 C.F.R. Part 50, App. F (emphasis added). As evidenced by Appendix F, the regulation relating to disposal of "high-level radioactive fission product waste" only applied to waste generated during reprocessing, not through the operation of commercial nuclear reactors. See American Nuclear Society website (http://www.ans.org/pi/resources/glossary/) (defining "high level waste" as "[h]ighly radioactive solid material that results from chemical reprocessing of spent fuel from a nuclear fission reactor" (emphasis added)). Reprocessing involves taking the spent nuclear fuel already generated during the production of nuclear power and reprocessing it into other forms. Id. (defining "spent nuclear fuel" as follows: "Nuclear fuel elements removed from a nuclear reactor after they have been used to produce power. Spent fuel has great potential for use as a fuel after reprocessing; thus "used fuel" is a more accurate term."). Accordingly, 10 C.F.R. Part 50 provides no promise of SNF disposal in general or by a date certain. In any event, to the extent that the CBO staff working paper cited by Atlantic overstated the requirements of a statute or regulation, that overstatement does not override the actual statutory and regulatory requirements of the Atomic Energy Act or the NWPA.[3]

---

[3] To the extent that Atlantic had some right under the AEA, 10 C.F.R. Part 50, or some other unidentified statute to DOE acceptance of SNF by a date certain, the NWPA clearly abrogated that right. The NWPA requires DOE to accept commercial SNF solely pursuant to the terms of the NWPA and requires commercial utilities, to the extent that they enter into contracts for disposal, to pay for that disposal. See 42 U.S.C. § 10222; State of Idaho v. U.S. Dep't of Energy, 945 F.2d 295, 297-99 (9th Cir. 1991). Since the NWPA was enacted in 1983, Atlantic's claims for a taking based upon rights purportedly abrogated by the NWPA are time-barred. Steel Improvement & Forge Co. v. United States, 174 Ct. Cl. 24, 29-30, 355 F.2d 627, 631 (1966) ("cause of action for an unconstitutional taking accrues at the time the taking occurs.").

C. Atlantic's Contention That The NWPA Creates A Basis For A Takings Claim, Outside The Existence Of A Contract, Is Unfounded

Atlantic's attempt to bypass the requirement that an executed Standard Contract exist before the Government would be obligated to accept a particular nuclear utility's SNF directly conflicts with the language of the NWPA. Contrary to Atlantic's assertions, the NWPA did not create any self-executing obligation upon DOE to accept a particular utility's SNF. Instead, section 302(a) of the NWPA, 42 U.S.C. § 10222(a), authorized the Secretary of Energy "to enter into contracts with any person who generates or holds title to [SNF] of domestic origin for the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1) (emphasis added). More significantly, the Secretary of Energy was – and is – expressly barred from disposing of any SNF under the NWPA, "unless the generator or owner of such [SNF] has entered into a contract with the Secretary under this section by not later than . . . June 30, 1983; or . . . the date on which such generator or owner commences generation of, or takes title to, such [SNF]; whichever occurs later." Id. § 10222(b)(2) (emphasis added).

DOE's obligation to dispose of any particular generator's SNF is expressly conditioned upon the existence of a contract between the generator and DOE. Absent a contract between DOE and a particular utility, DOE is barred from accepting that utility's SNF. As a result, Atlantic's contention that it somehow has a statutory right to DOE acceptance of its SNF, outside the context of the Standard Contract, is unsupported by precedent and contrary to the express

---

Likewise, to the extent that Atlantic is complaining that the Government prohibited Atlantic from reprocessing its SNF through President Carter's order in the 1970s, see Pl. Opp. 9, that claim also is time-barred.

language of the NWPA.[4] Accordingly, it is clear that Atlantic's takings claim in this case is based solely upon the Government's contractual obligation to accept SNF and/or HLW from the Hope Creek, Peach Bottom, and Salem nuclear reactors in which Atlantic allegedly had a minority ownership interest.

## II. ATLANTIC'S TAKINGS CLAIM FAILS BECAUSE IT IS PREDICATED UPON A BREACH OF A CONTRACT WITH THE GOVERNMENT

As we demonstrated in our motion to dismiss, it is well-established that, where a party's rights are created by contract, that party cannot state a takings claim founded upon a breach of that contract. See Def. Br. 10-15. Although we cited to an extensive number of cases support that rule of law, Atlantic has attempted to distinguish only two of them: Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003), and Castle v. United States, 48 Fed. Cl. 187 (2000), aff'd in relevant part, 301 F.3d 1328 (Fed. Cir. 2002). Pl. Opp. 15. In attempting to distinguish the Commonwealth Edison holding, Atlantic misrepresents the basis for the Court's decision in that case, asserting the Court "determined that the plaintiff's rights were enforceable through a contract remedy, and that dismissal of a taking claim found to be redundant could therefore not diminish the plaintiff's recovery." Pl. Opp. 15-16 (citing Commonwealth Edison, 56 Fed. Cl. at 656). Although the Court held that "plaintiff's claim for a taking is dependent upon the existence of the Standard Contract and therefore plaintiff's rights are enforceable through a contract remedy," Commonwealth Edison, 56 Fed. Cl. at 656, nowhere did the Court find the existence of

---

[4] Because the NWPA does not create a "property right" requiring DOE to accept and dispose of Atlantic's SNF, an alleged violation of the NWPA cannot constitute a taking of Atlantic's property right. See, e.g., Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1340 (Fed. Cir. 2001) (provision of Energy Policy Act requiring domestic utilities that had entered into contracts with the Government for processing uranium to pay for costs of cleanup of environmentally contaminated uranium processing facilities was not a Fifth Amendment taking).

"redundant claim" or conclude that dismissal of the takings claim would "not diminish the plaintiff's recovery," as Atlantic alleges.

Atlantic's single sentence treatment of the four-page takings analysis in Castle misstates the conclusions of this Court. While the Court noted that the plaintiffs "have available, and indeed have successfully pursued, contract-based claims," Castle, 48 Fed. Cl. at 218, this statement, among other facts, merely contributed to the Court's conclusion that the plaintiffs had not suffered a taking. Id. Although not mentioned by Atlantic, this Court in Castle further determined that all of the cases cited by the plaintiffs purportedly supporting a takings claim predicated upon the abrogation of contract rights were distinguishable because "none of those cases challenges the basic principle that a litigant to whom a contract remedy is available has not been deprived of the rights conferred on him by contract." Id. Further, it is irrelevant whether the plaintiff actually has any rights under the contract that it could pursue, as the only relevant issue is whether those contractual remedies that the plaintiff had, if any, were "taken" from him. Admiral Fin. Corp. v. United States, 378 F.3d 1336, 1340 (Fed. Cir. 2004). It is this conclusion that is dispositive of Atlantic's claim here.

In addition to Atlantic's failure to address any of the other cases upon which the Government relied, Atlantic fails to identify a single case supporting the proposition that a takings claim can arise from a breach of a contract with the Government.[5] Instead, Atlantic

---

[5] Atlantic cites to the Federal Circuit's decisions in Chancellor Manor v. United States, 331 F.3d 891 (Fed. Cir. 2003), and Del-Rio Drilling Programs, Inc. v. United States, 146 F.3d 1358 (Fed. Cir. 1998), to support the view that contract and takings claims can co-exist. Pl. Opp. 21-22. However, neither of those decisions supports the view that contract rights arising from a contract with the Government which the Government breaches constitute a "taking." To the contrary, and as previously explained, to establish a "taking" outside the context of the contract, the plaintiff must identify a property right unrelated to the rights created by contract that has been

attempts to analogize its cause of action to takings claims arising from physical occupations of property by the Government (see, e.g., Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 421 (1982)), and from the federalization of private enterprises (see, e.g., United States v. Pewee Coal Co., 341 U.S. 114 (1951); Kimball Laundry Co. v. United States, 338 U.S. 1 (1949)). Pl. Opp. 12-13. Atlantic's attempts to squeeze its claim within the line of physical takings cases fails examination. Atlantic does not allege that DOE's breach of the Standard Contract resulted in a physical occupation of the utility sites. Moreover, Atlantic does not allege that DOE's breach resulted in the federalization of the utilities' business operations. The cases upon which Atlantic relies are far afield from the claims it is pursuing here. This Court should look instead to the cases cited in the Government's motion for guidance as to the viability of Atlantic's contract-based takings claim.

Since we filed our motion to dismiss, this Court and the United States Court of Appeals for the Federal Circuit and this Court have reviewed takings claims based upon breaches of a contract with the Government. In LaVan v. United States, Nos. 03-5140, -5149, 2004 WL 1949853 (Fed. Cir. Sept. 3, 2004), the Federal Circuit upheld the dismissal of plaintiff's contract-related takings claim and recognized, in concluding that plaintiff's takings claim was properly dismissed, that it had "consistently reaffirmed [the] binding precedent" of Castle. Id. at *10; see Admiral Fin., 378 F.2d at 1340 (precluding takings claim under rationale of Castle). Likewise, in Franconia Assoc. v. United States, 2004 WL 1941215 (Fed. Cl. Aug. 30, 2004), this Court

---

taken. Here, no utility's "right" to have DOE begin accepting its SNF by January 31, 1998, exists outside the context of a contract. See 42 U.S.C. § 10222. Further, the issue of whether the plaintiff's takings claim in Del-Rio was based solely upon rights arising from a contract with the Government was neither raised nor addressed in that case. Accordingly, Atlantic's reliance on Chancellor Manor and Del-Rio is misplaced.

dismissed a plaintiff's contract-based takings claim, finding that "the government is only liable for a taking if it uses its power to appropriate a contract for public use – i.e., if it steps into the shoes of one of the contracting parties" and that "[t]hat is not what occurred here." Id. at *15 (citing Omnia Commercial Co. v. United States, 261 U.S. 502, 510 (1923)). In this case, the Government did not "step into the shoes" of the plaintiff with regard to the Standard Contracts relating to the Salem, Hope Creek, or Peach Bottom facilities. Further, Atlantic does not and cannot allege that DOE's breach of the Standard Contract resulted in the taking of the contract itself. Accordingly, Atlantic has no basis upon which to allege a takings claim.[6]

## III. ATLANTIC'S CONTENTION THAT IS IT AN "EXPRESS INTENDED BENEFICIARY" UNDER THE STANDARD CONTRACT UNDERMINES ITS CLAIM THAT IT SEEKS A REMEDY INDEPENDENT OF THE STANDARD CONTRACT

Atlantic contends that, as an "express intended beneficiary" under the Standard Contract, it is entitled to pursue its alleged rights arising under the Standard Contract as a takings claim. Pl. Opp. 22-23. In support of this assertion, and although not mentioned in its complaint, Atlantic contends that it is "specifically named in the Standard Contracts for the Nuclear Stations

---

[6] Recently, this Court denied a motion to dismiss one of the SNF plaintiff's takings claims in Sacramento Municipal Utility District v. United States, 61 Fed. Cl. 438 (2004) (Braden, J.) ("SMUD"), stating that "where the Government has forced storage on another's private property the Just Compensation Clause is implicated." Id. at 442. With all due respect, we disagree with the Court's decision to the extent that it applies to rights created by a contract with the Government. The fact that the plaintiff's rights to removal of the SNF by a date certain were created solely by contract requires that any damages claim focus upon the contract, not upon recovery for a Fifth Amendment taking. Nevertheless, the claim in SMUD is different from that alleged by Atlantic. The Court allowed a takings claim to proceed that was predicated upon acceptance limits in the 1987 amendments to the NWPA, not one based upon a failure to accept any waste by January 31, 1998, as Atlantic alleges here. Id. at 41-42. Moreover, the Court in SMUD allowed a claim for the taking of land upon which SNF currently is stored to proceed – a claim that is not asserted by Atlantic. Id. at 442-43.

as one of the owners intended to benefit from these contracts," Pl. Opp. 23, and that this fact somehow creates a right for it to pursue damages for a taking of its property.[7] Atlantic's allegations evidence that Atlantic's alleged property interest derives exclusively from the Standard Contracts and, therefore, that the pursuit of damages under a takings theory is inappropriate. Indeed, assuming for the sake of argument that Atlantic is an express beneficiary of the Standard Contracts, Atlantic has failed to explain the reasons that it has declined to bring a contract action rather than a takings claim under the circumstances. Atlantic's assertion, contained nowhere in its complaint, that it is an express third-party beneficiary of the Standard Contracts undermines its contention that its claim is distinct from the Standard Contracts.[8]

## IV. ATLANTIC'S CONTENTION THAT THE FEDERAL CIRCUIT HAS ALREADY DETERMINED THAT SPENT NUCLEAR FUEL PLAINTIFFS MAY PURSUE CONTRACT AND TAKINGS CLAIMS CONCURRENTLY IS UNFOUNDED AND MISLEADING

Atlantic contends that the Federal Circuit has "recognized that a nuclear utility's legal and property rights existed prior to and, thus, independent from, the execution of the Standard Contract," citing Yankee Atomic Electric Co. v. United States, 42 Fed. Cl. 223 (1998), and the

[7] Although now Atlantic refers to paragraphs 22 and 60 of its complaint for its assertion that it was specifically named in the Standard Contracts at issue here, this fact appears nowhere in its complaint. For this reason alone, Atlantic's contention that it is an express third-party beneficiary of the Standard Contract should be disregarded. See Turman v. Commonwealth Edison Co., No. 86-C-136, 1986 WL 5018, at *2 (N.D. Ill. Apr. 22, 1996) (rejecting alleged facts made in response to motion to dismiss that were not contained in complaint); see also Shanahan, 82 F.3d at 781.

[8] Atlantic maintains that "the Government's Motion offers no legal support for its assertion that privity is a prerequisite to Atlantic's takings claim." Pl. Opp. 22. As explained on page 7 of the Government's motion, this Court in McNabb v. United States, 54 Fed. Cl. 759 (2002), held that, assuming for the sake of argument that a plaintiff could allege a taking based upon a breach of a contract, "the absence of privity is fatal to a takings theory." Id. at 779. Atlantic does not address, much less dispute, the Court's decision in McNabb.

decision issued by the Federal Circuit upon review of the Yankee decision, Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1342 (Fed. Cir. 2000). Pl. Opp. 11. Atlantic's interpretation of the Court's decision is highly misleading. In Maine Yankee, the Government filed a motion to dismiss the plaintiff's complaint for lack of jurisdiction, arguing that the plaintiff was required to exhaust its administrative remedies before it could proceed with either its breach of contract and takings claim in this Court. However, the Court found that, with regard to the plaintiff's breach of contract claim, the "Avoidable Delays" and "Disputes" clauses contained in the Standard Contract did not encompass the delay at issue in this case and that, therefore, no administrative exhaustion was required before the plaintiff could pursue its contract claim. See Maine Yankee, 225 F.3d at 1342. The Court stated that the Mainee Yankee plaintiff "was not required to invoke the contract's disputes clause before bringing suit" and that its takings count "cannot be viewed as constituting avoidable delays under that clause." Id. at 1342-43.

Contrary to Atlantic's contention, the Federal Circuit in Maine Yankee did not make any determination that the plaintiff's takings claim stated a viable cause of action. To the contrary, the only motion that the Court was considering was a jurisdictional motion requesting dismissal based upon the plaintiff's failure to exhaust its administrative remedies. The Federal Circuit was neither presented with nor considered arguments regarding the viability of a takings claim outside the context of the Standard Contract. Atlantic's suggestion that the Federal Circuit somehow has already ruled favorably upon the merits of its takings claim is simply unfounded.

## V. THE GOVERNMENT'S FAILURE TO BEGIN SNF ACCEPTANCE BY JANUARY 31, 1998 DOES NOT CONSTITUTE A REGULATORY TAKING

As an alternative to its physical takings claim, Atlantic appears to assert that DOE's failure to begin accepting its SNF by January 31, 1998, constitutes a regulatory taking, asserting that a taking occurs if "regulation goes too far" and interferes with "distinct investment-backed expectations of the owner." Pl. Opp. 14. However, before it analyzes whether Government action constituted a regulatory taking, it must identify whether a protected property interest exists or, in other words, whether "the use interest proscribed by the government action was part of the owner's title to begin with." M&J Coal Co. v. United States, 47 F.3d 1148, 1154 (Fed. Cir.), cert. denied, 516 U.S. 1995). As previously discussed, because the NWPA did not create a right in a particular utility to SNF acceptance beginning by January 31, 1998, outside the existence of a contract, see 42 U.S.C. § 10222, Atlantic could not have had a "right" to SNF acceptance by a date certain outside of the Standard Contracts.

To the extent that Atlantic asserts that it had some general expectation of SNF acceptance, this Court has recognized that an "investment-backed expectation is not property." Ambase Corp. v. United States, 58 Fed. Cl. 32, 51 (2003). In Ambase, the plaintiff had alleged that, "as the sole shareholder of [the contracting party], it had a reasonable investment-backed expectation that the government would honor the goodwill contracts with [the contracting party], and that the enforcement of FIRREA confiscated that expectation . . . ." Id. at 50. The Court rejected this argument, finding that, because the "right" at issue was created through a contract with the Government, the only remedy was a contract-based remedy by the contract holder:

> In light of these general concepts, the issue in this case is whether an action by the government against the corporation, that destroys the corporation's value, can be the legal cause of the shareholder's loss in value. The answer seems to the Court to depend on what the character of the government action was. If the government's action is legally compensable under some remedial system then the answer appears to be that there is no legal cause that would justify a takings claim. In this case that is clearly the situation. The government's breach of contract creates in the corporation, here Carteret, a cause of action against the government. If Carteret prevailed in the breach of contract action, the corporation would be restored to the position it would have been in and the shareholder would have lost nothing by the government's action. Therefore, the takings claim can only exist if there is no remedy other than a takings claim for the government's breach of contract. But clearly there is a contract remedy.

Id. at 52 (emphasis added; citations omitted). Because PSEG and PECO have contract remedies and have availed themselves of those contract remedies by filing suit in this Court (Docket Nos. 01-551C (now pending) and 04-102C (subsequently amicably resolved)), no valid regulatory takings claim exists.

## VI. ATLANTIC'S ASSERTION THAT PAYMENT OF FEES INTO THE NUCLEAR WASTE FUND SOMEHOW CONSTITUTES A "TAKING" OF ITS PROPERTY IS MERITLESS

### A. Because An Obligation To Pay Fees Into The Nuclear Waste Fund Is Created By Contract, That Obligation Cannot Form The Basis Of A Takings Claim

Atlantic also contends that its takings claim should proceed because Atlantic "alleges a taking of its property accomplished through over-collection of the 1 mil per kWh fee well in excess of that authorized by the NWPA." Pl. Opp. 16. It is unclear whether Atlantic believes that the collection of the fee itself constitutes a taking of its property or, instead, whether the payment of the fee somehow creates some right that has been taken. Regardless of the meaning

of its allegation, it is meritless. First, absent the Standard Contract, no fees need be paid into the Nuclear Waste Fund ("NWF"). See 10 C.F.R. § 961.11, Art. VIII. Although the amount of the fee is set by statute, based upon a "1.0 mil per kilowatt-hour" charge, 42 U.S.C. § 10222(a)(2), nothing in the NWPA itself requires any entity to pay this fee into the NWF. Instead, the NWPA provides that contracts into which the Secretary of Energy enters pursuant to the NWPA "shall provide for the payment to the Secretary of [these] fees . . . sufficient to offset expenditures . . ." and that, if an entity enters into a contract with the Secretary for disposal of its SNF, the contract will require the contract holder to pay the fees. 42 U.S.C. § 10222(a)(1). For the reasons previously explained, Atlantic cannot take a fee payment required only by contract and somehow create a cognizable takings claim.

B. Because The Standard Contracts At Issue Did Not Require *Atlantic* To Pay Fees Into The Nuclear Waste Fund, Any Payment Of Fees By Atlantic Was Not "Compelled" By The Government

As discussed in the Government's motion, Atlantic has no basis upon which to raise an excess payments claim. Only the party to the Standard Contract is responsible for paying the fees associated with the SNF generation at its facility. Atlantic does not allege in its complaint that it was the "Purchaser" as that term is utilized in the Standard Contracts. See generally 10 C.F.R. § 961.11. The Standard Contract provide that the "Purchaser" shall be charged a fee, see 10 C.F.R. § 961.11, Art. VIII.A.1, and that the "fee shall be paid quarterly by the Purchaser . . . ." Id., Art. VIII.B.1 (emphasis added). Atlantic was not a signatory to any of those Standard Contracts, Pl. Opp. 6, and does not allege that it was the "Purchaser" obligated to pay fees into the NWF in any of those contracts. As previously discussed, except through those contracts, no fees had to be

paid. Accordingly, Atlantic cannot identify any basis upon which it was contractually or otherwise obligated to pay NWF fees.

"To hold the United States liable for a taking, plaintiffs must show that the federal government has done some affirmative act that deprives the plaintiffs of their property or that interfered with or disturbed their property rights." Custom Contemporary Homes, Inc. v. United States, 5 Cl. Ct. 88, 90 (1984) (citing D.R. Smalley & Sons, Inc. v. United States, 178 Ct. Cl. 593, 598-99, 372 F.2d 505, 508, cert. denied, 389 U.S. 835 (1967)). "A fundamental requirement for any taking is that the challenged governmental action create legal compulsion." Hinesburg Sand & Gravel, Co., Inc. v. Chittendon Solid Waste District, 959 F. Supp. 652, 657 (D. Vt. 1997). Here, Atlantic cannot establish any basis upon which it was "compelled" by the Government to pay fees into the NWF. The only entities with a legal liability for those fees under the Standard Contracts at issue are the Purchasers. To the extent that Atlantic voluntarily paid fees for the Purchasers, its voluntary actions cannot form the basis of a takings claim against the Government. To the extent that Atlantic had arrangements with the Purchasers to pay fees for those entities, Atlantic's complaint is with the Purchasers, not the Federal Government, and its internal agreements cannot create the type of "compulsion" by the Federal Government giving rise to a takings claim. As a result, Atlantic cannot assert a taking.[9]

[9] Even if this Court were to conclude that Atlantic was obligated to pay the fee, that obligation does not constitute a taking. See Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1340 (Fed. Cir. 2001) (mere imposition of obligation to pay money does not give rise to a takings claim); United States Shoe Corp. v. United States, 296 F.3d 1378, 1383 (Fed. Cir. 2002). "Unlike real or personal property, money is fungible." United States v. Sperry Corp., 493 U.S. 52, 62 n.9 (1989). Accordingly, "[r]equiring money to be spent is not a taking of property." Atlas Corp. v. United States, 895 F.2d 745, 756, cert. denied, 498 U.S. 811 (1990).

C. This Court Lacks Jurisdiction To Entertain Claims Relating To The Amount Of The Nuclear Waste Fund Fees

Even if Atlantic had been compelled to pay fees into the NWF, this Court would lack jurisdiction to adjudicate Atlantic's challenge to the legality of DOE's actions concerning the collection of those fees. Section 10139 of Title 42 of the United States Code provides that the United States Court of Appeals shall have original and exclusive jurisdiction over, among other things, any of the following civil actions: (1) review of any final decision or action of the Secretary of Energy; (2) allegations concerning the failure of the Secretary of Energy in making any decisions or taking any actions under this section; and (3) challenges to the constitutionality of any decision made, or action taken under this section. 42 U.S.C. § 10139(a)(1)(A), (B), & (C). In this regard, section 10222(a)(4) provides that the Secretary shall annually review the amount of the fee and, if he views it as insufficient or excessive, and to report to Congress. 42 U.S.C. § 10222(a)(4). The District of Columbia Circuit has held unequivocally that challenges relating to the collection of fees under the NWPA are under the original and exclusive jurisdiction of the United States Court of Appeals. General Elec. Uranium Mgt. Corp. v. United States Dep't of Energy, 764 F.2d 896, 907 (D.C. Cir. 1985); see Natural Resources Defense, 244 F.3d at 743 (acknowledging original and exclusive jurisdiction of United States Courts of Appeal to entertain challenges relating to NWF).

Although Atlantic contends that DOE's alleged over-collection of fees into the NWF constitutes a taking of Atlantic's property, neither Atlantic nor the "Purchasers" under the Standard Contracts at issue in this case, PSEG Nuclear Inc. ("PSEG") and Pennsylvania Electric Company ("PECO"), has ever previously challenged DOE's assessment of the fee, either pursuant

to the "Disputes" provision of the Standard Contract, 10 C.F.R. § 961.11, Art. XVI, or through a direct challenge at the United States Court of Appeals. If the Governmental action about which a party complains leaves open the possibility that the owner of the property may obtain a change or exception to the Government action, the owner must pursue that possibility and be denied before a taking can occur. Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc. v. United States, 452 U.S. 264, 297 (1981); E-Systems, Inc. v. United States, 2 Cl. Ct. 271, 278 (1983). Atlantic's failure to pursue any challenge to DOE's fee collections since 1983, either through the contract or through a challenge to the United States Courts of Appeal, precludes a challenge to the fee here.[10]

CONCLUSION

For the foregoing reasons, and those set forth in our motion to dismiss, the Government respectfully requests that the Court dismiss Atlantic's complaint for failure to state a claim upon which relief may be granted.

---

[10] We are not suggesting that, if Atlantic had pursued a challenge to the fee collection at a United States Court of Appeal and was denied, it would then have a basis for asserting a takings claim in this Court. To the contrary, the United States Courts of Appeal have exclusive jurisdiction to entertain challenges to the fee. However, having failed to pursue that avenue of relief, Atlantic cannot circumvent that requirement by proceeding directly in this Court.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Joshua E. Gardner
JOSHUA E. GARDNER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7583
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of September 2004, a copy of foregoing "DEFENDANT'S REPLY TO PLAINTIFF"S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s Joshua E. Gardner