**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ATLANTIC CITY ELECTRIC COMPANY,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 04-0036G** |
| **UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**FIRST AMENDED COMPLAINT**

1. This is an action by Plaintiff, Atlantic City Electric Company ("Atlantic"), against Defendant, the United States of America, acting by and through the U.S. Department of Energy ("DOE"), for breach of contract and breach of the implied covenant of good faith and fair dealing, and for just compensation for uncompensated taking in violation of the Fifth Amendment to the U.S. Constitution caused by DOE's failure to meet its obligations under the Nuclear Waste Policy Act of 1982 ("NWPA" or "Act"), as amended, 42 U.S.C. §§ 10101 *et seq*., and the Standard Contract, to begin removal and disposal of Spent Nuclear Fuel and high-level nuclear waste ("SNF") at the Salem Nuclear Generation Station Units 1 and 2 ("Salem"), Hope Creek Nuclear Generating Station ("Hope Creek"), and Peach Bottom Atomic Power Station Units 2 and 3 ("Peach Bottom") (collectively, the "Nuclear Stations"). This Amended Complaint incorporates Atlantic's previously filed Complaint in this matter, and supplements and amends that Complaint as set forth herein.

2. Atlantic was a minority interest owner of the Nuclear Stations. On October 18, 2001, Atlantic transferred its interests in the Nuclear Stations to the two co-owners of the Nuclear Stations, PSEG Power LLC ("PSEG") and PECO Energy

Company ("PECO"). Atlantic transferred the following interests to PSEG: (i) a 7.41% interest in Salem, (ii) a 3.755% interest in Peach Bottom; and (iii) a 5% interest in Hope Creek. Atlantic also transferred a 3.755% interest in Peach Bottom to PECO.

3. Pursuant to NWPA, DOE was required to commence accepting and permanently disposing of SNF by January 31, 1998 in return for payments of substantial fees by nuclear plant owners into a Nuclear Waste Fund. The NWPA also required DOE to enter into a "Standard Contract" with each of the nation's commercial nuclear power plant owners, including Atlantic, which required DOE, in return for payment of substantial fees by the owners into the Nuclear Waste Fund, to commence accepting and permanently disposing of the SNF from these nuclear facilities by January 31, 1998.

4. By the closing date of Atlantic's sale of the Nuclear Stations, Atlantic's payments into the Nuclear Waste Fund exceeded $7.9 million. DOE did not begin to take custody or dispose of Atlantic's SNF by January 31, 1998, or by the closing date of Atlantic's sale of the Nuclear Stations. By the closing date of Atlantic's sale of the Nuclear Stations, there was no prospect that DOE would take custody or dispose of SNF from the facilities in the foreseeable future because DOE had not then (and has not to this day) sited, licensed, constructed, or placed in operation an SNF disposal facility, or made provisions for the temporary storage of SNF until such time as a permanent SNF disposal facility becomes available.

5. As a direct and proximate result of DOE's failure to meet its statutory and contractual obligations to remove SNF on January 31,1998, Atlantic suffered substantial economic harm including a drastic reduction in the fair market value of the Nuclear Stations. Atlantic realized significantly less value in the sale of the Nuclear Stations than it would have received had DOE properly fulfilled its statutory and

contractual obligations. The value of the Nuclear Stations was significantly diminished when it became apparent that DOE would not begin accepting and removing SNF by January 31, 1998. This diminishment continued beyond this deadline as DOE's statutory and contractual violations continued with no SNF disposal solution in sight. This caused potential buyers either to elect not to participate in the sales process for nuclear facilities or drastically to reduce their price in order to account for the increased risk associated with the uncertain life expectancy of the Nuclear Stations and the anticipated capital expenses associated with storing SNF indefinitely.

6. DOE's failure to fulfill its statutory and contractual obligations also diminished the value of the benefits Atlantic received under the Standard Contract, and the value of the Standard Contract itself.

**7.** Atlantic also incurred significant costs associated with the interim storage of its SNF up to the closing date of its sale of the Nuclear Stations, including additional capital expenses and related operation and maintenance expenses. These costs would not have been incurred had DOE began the acceptance and removal of SNF by January 31, 1998, as required. Accordingly, Atlantic was deprived of the full economic value of its property, and seeks damages for costs, including lost value of the Nuclear Stations and the Standard Contract, it incurred up to the date of the sale of the Nuclear Stations that would not have been incurred had DOE performed its statutory and contractual obligation pertaining to SNF disposal.

8. Atlantic's case is distinguishable from the SNF cases presently before this Court. Those cases have been filed predominantly by the existing owners/operators of the nuclear facilities seeking damages related to ongoing SNF storage costs. By contrast, as a seller of nuclear-generating assets, Atlantic's First Amended Complaint

seeks damages and just compensation associated with the diminished fair market value of the Nuclear Stations and the Standard Contract resulting from DOE's failure to meet its obligations under the Act and the Standard Contract, as well as other related costs incurred up to the closing date of the sale. Unlike the existing owner/operator cases, Atlantic's damages, as well as the just compensation owing to it, are fixed and readily ascertainable as of the closing date of its sales transactions.

## JURISDICTION

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1491(a)(1).

## PARTIES

10. Plaintiff Atlantic is a public utility company incorporated under the laws of the State of New Jersey and is subject to the regulatory jurisdiction and oversight of the New Jersey Board of Public Utilities ("NJBPU") with respect to its regulated assets (such as the Nuclear Stations) and the rates it can charge with respect to the use of those assets.

11. Atlantic is a wholly owned subsidiary of Conectiv. On or about August 1, 2002, Conectiv and Potomac Electric Power Company merged forming Pepco Holdings, Inc. Atlantic provides a wide range of energy-related products and services to its customers, serving approximately 497,000 customers through its regulated businesses.

12. Defendant is the United States of America, acting by and through DOE.

## BACKGROUND

13. For more than fifty years, the federal government systematically acted to induce electric utilities, including Atlantic, to invest in nuclear technology on the promise, both implied and explicit, that key issues affecting utilities' adoption of the technology would be resolved in a timely and economic manner. Among the promises of the federal government was that it would adequately provide for assuming custody and disposal of SNF. Atlantic relied on these representations and made substantial capital investments in the construction of the Nuclear Stations in order to support the Nuclear Stations' continued operation. It was reasonable for electric utilities, including Atlantic, to have relied on the federal government to exercise its reasonable efforts to perform and fulfill its own promises.

14. On December 8, 1953, President Dwight D. Eisenhower announced to the United Nations his intent to employ nuclear materials "to provide abundant electrical energy in the power-starved areas of the world." Dwight D. Eisenhower, Address Before the General Assembly of the United Nations on Peaceful Uses of Atomic Energy, New York City (Dec. 8, 1953), *in Public Papers of the Presidents: Dwight D. Eisenhower* ¶ 256, at 821 (1953). The Atomic Energy Act of 1954 was subsequently passed on August 30, 1954. Notably, the Atomic Energy Act instructed the U.S. Atomic Energy Commission ("AEC"), the predecessor agency to the Nuclear Regulatory Commission ("NRC"), to encourage commercial development and use of nuclear energy, and to issue licenses to private companies to build and operate nuclear power stations.

15. Guided by the Atoms for Peace initiatives, the AEC announced the "Power Reactor Demonstration Program" in January 1955 with the objective of encouraging and supporting the commercial development of nuclear power.

16. In 1959, six years following President Eisenhower's Atoms for Peace speech, it was becoming clear that the then-current levels of federal promotion of commercial nuclear power plant construction were not sufficient to move the technology toward wider commercialization. In March 1962, President John F. Kennedy asked AEC Chairman Glenn Seaborg to report on the role of nuclear power in the country. Notably, Chairman Seaborg urged the President to continue to encourage and support the commitment of electric utilities to nuclear generation.

17. Throughout this period, the federal government continued to represent that it would provide mechanisms for SNF storage and disposal, among which would be the continued utilization of nuclear fuel reprocessing. Consequently, electric utilities, including Atlantic, designed, and the AEC (and subsequently the NRC) licensed and approved for operation, nuclear power facilities with SNF pools intended only for temporary storage and for only a fraction of the facilities' forty-year license lives.

18. In 1976, President Gerald R. Ford announced a moratorium on reprocessing SNF consistent with new arms control initiatives. This moratorium coincided with a surge in the number of commercial operating reactors entering service. Whereas reprocessing had previously been expected to limit the growth of SNF inventories at commercial nuclear power reactor sites, in the absence of reprocessing, the inventory of SNF at reactor sites began to rapidly increase until the limited, temporary storage capacity of the SNF pools at these plants was consumed.

19. In 1977, President Jimmy Carter announced that SNF would be transferred to a federally approved "away from reactor" facility for storage until a federal government repository became available. President Carter said the federal

government would charge a one-time fee for storage. The President also established the Interagency Review Group on Nuclear Waste Management ("IRG"). IRG issued its findings in 1979, which proposed, among other things, that the federal government construct and operate a repository for permanent SNF disposal by the early 1990s.

**THE NUCLEAR WASTE POLICY ACT OF 1982**

20. NWPA was signed into law by President Ronald Reagan in January 1983. 42 U.S.C. § 10101 *et seq*. Passage of NWPA represents the government's acceptance of responsibility for the disposal of SNF. Congress passed NWPA to address and ameliorate the accumulation of SNF from nuclear reactors, and to fulfill the federal government's long-standing policy of assuming responsibility for the disposal of SNF. Recognizing that reprocessing of SNF was not a viable alternative to disposal of SNF, Congress created the Act "to establish programs for the development of repositories for the safe permanent disposal of high level nuclear waste and spent fuel." H.R. Rep. No. 97-491, pt. 1, at 26 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792, 3792. Congress also made clear that time was of the essence and made the disposal of SNF an immediate federal priority:

> The failure of the government to provide a permanent waste disposal facility during more than 30 years of Federal nuclear activities is unmitigated. . . . Failures in the Federal repository development program, the collapse of the domestic spent fuel reprocessing industry and quickly deteriorating public confidence in our ability to deal safely with nuclear waste, together with other critical safety and economic issues, were seriously undermining the strength of the domestic nuclear industry.

*Id.* at 28, 1982 U.S.C.C.A.N. at 3794.

21. The purpose of NWPA was, among other things, to establish a schedule for the location, construction, and operation of repositories for the disposal of SNF, and to initiate ownership and custody of SNF by the federal government at a

permanent disposal facility beginning in January 1998. Thus, NWPA established the federal government's exclusive responsibility for the disposal of SNF beginning in January 1998.

22. Congress recognized in 1982 that neither reprocessing nor a federal waste repository would be available for at least ten years, and that interim storage of SNF would be needed. *Id*. at 31, 37-38, 67, 1982 U.S.C.C.A.N. at 3797, 3803-04, 3833. Notwithstanding this, Congress did not specifically authorize any particular interim storage program or facility, leaving to nuclear licensees the burden for safely storing SNF on-site until such time as DOE would take custody. Congress gave DOE until January 31, 1998, a full sixteen years, to complete what Congress felt could be accomplished in less time. Twenty-one years have now passed and DOE still cannot state when, or if, a permanent, national SNF repository will be available.

23. Pursuant to the Act, DOE was obligated to fulfill three primary tasks: (1) conduct an annual review of the fees imposed on facilities and determine if the revenues associated therewith would be sufficient to cover the costs associated with SNF disposal activities taken pursuant to the Act (42 U.S.C. § 10222(a)(4)); (2) begin disposal of SNF no later than January 31, 1998 (*id.* § 10222(a)(5)); and (3) establish a schedule for locating, constructing, and operating repositories for SNF disposal, including publishing written criteria that set forth the terms and conditions by which DOE would make disposal services available to utilities (*id.* §§ 10131(b)(1), 10222(a)(6)). Among these terms was a requirement that title to SNF pass to DOE at the time it was to be transported from the power plant site to a DOE facility. *Id*. § 10222(a)(1), (5)(A).

24. NWPA also provided that the costs of fulfilling DOE's obligations as specified in the statute were to be borne by the generators of SNF in the form of annual

fees levied by DOE on a per kilowatt hour basis from electric generation produced at nuclear facilities subject to a Standard Contract. In order to match DOE costs incurred in providing for permanent SNF disposal with Nuclear Waste Fund fee revenues, NWPA specified that the DOE Secretary was to conduct an annual review of the fees collected to determine if fee revenues were sufficient to cover the costs associated with SNF disposal activities undertaken pursuant to NWPA. *Id*. § 10222(a)(4). In the event that the DOE Secretary determined that either insufficient or excess funds were being collected, then an adjustment to the fee schedule was to be proposed by the Secretary to Congress, which had ninety days to reject the Secretary's fee adjustment proposal. *Id*. Unless the Secretary's fee adjustment proposal was rejected by Congress, it automatically went into effect. *Id*.

25. NWPA vested DOE with the sole authority to accept title to, transport, and dispose of SNF. The Act authorized DOE to contract with utilities and other producers of high-level nuclear waste to collect and take custody of SNF. Accordingly, in 1983, DOE drafted a Standard Contract for use with participants in the program, published it in the Federal Register, and accepted comments from the public regarding the terms of the Standard Contract.

**The Standard Contract**

26. On or about April 18, 1983, DOE codified the "Standard Contract" in the Code of Federal Regulations at 10 C.F.R. § 961.11. Consistent with NWPA, the Standard Contract provides that DOE would begin acceptance of SNF no later than January 31, 1998 in return for a one-time fee for pre-1983-generated nuclear waste, as well as for an ongoing fee assessed by DOE against SNF generators. The fee was initially set at 1.0 mill per kilowatt hour (1 mil/kwh) of electricity generated and sold by

Standard Contract holders. DOE was authorized under the Standard Contract to collect only those fees which were sufficient to achieve full cost recovery for a nuclear waste disposal program that was in compliance with the requirements of NWPA. With respect to DOE's performance obligations, the Standard Contract provides that "[t]he services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF . . . has been disposed of." 10 C.F.R. § 961.11, Art. II. Atlantic was subject to NWPA but was not a signatory to the Standard Contract. Atlantic was, however, as a minority owner of interests in the Nuclear Stations, an intended beneficiary of the Standard Contracts entered into with DOE by the respective operators of the Nuclear Stations on Atlantic's behalf.

27. The fees paid by all nuclear waste-generating entities pursuant to the Act were intended to fund DOE's development and implementation of a national SNF disposal facility and program as contemplated by Congress. All such fees were, and continue to be, paid into a Nuclear Waste Fund by the owners of nuclear waste-generating facilities.

28. DOE, since the passage of NWPA, has been under an ongoing obligation to implement an on-time program for the construction and operation of a permanent, national SNF repository by January 31, 1998, and to fully recover the actual costs of meeting this objective. In addressing the fee payment obligations the utilities were to assume under NWPA, the Congressional Budget Office noted on April 26, 1982, when the bill was before Congress, that in order to match program funding with the mandated January 31, 1998 repository operational date, "[i]t is expected that the majority of the costs of this bill will be incurred by the year 2000 when repository

construction is expected to be completed and the facility operational." H.R. Rep. No. 97-491, pt. 1, at 67, 1982 U.S.C.C.A.N. at 3833.

29. Utilities and other producers of SNF, including Atlantic, have been required to pay, through Nuclear Waste Fund fees assessed by DOE, all of the costs associated with the SNF disposal program. Since its inception, consumers of nuclear-generated power nationwide have paid in excess of $19 billion, directly and through earned interest, into the Nuclear Waste Fund.

30. As a minority owner of the Nuclear Stations, Atlantic paid in excess of $7.9 million into the Nuclear Waste Fund up to the closing date of the sale of its interests in these facilities for the removal of the SNF to which Atlantic had title.

31. On May 18, 1998, DOE announced an expenditure plan for the nuclear waste disposal program through the year 2010 (the "1998 DOE Plan"). The 1998 DOE Plan recognized that DOE would be unable to meet its statutory obligations to begin removal and disposal of SNF until 2010 at the earliest. However, the 1998 DOE Plan indicated that DOE intended to continue to collect the 1 mil/kwh fee through 2010, which would produce an annual aggregate payment into the Nuclear Waste Fund of approximately $600 million, as contrasted with the 1998 DOE Plan's anticipated annual expenditures of $340 million. The 1998 DOE Plan states that total fees collected from 1983 through 1998, less program expenditures, yielded a positive fund balance of approximately $8 billion, nearly twice the amount necessary to fully fund DOE's anticipated program expenditures through 2010 without any additional fee collections. Nevertheless, DOE continued to collect the 1 mil/kwh fee and does so to this day.

**32.** NWPA and the Standard Contract obligated DOE to collect by January 31, 1998 all fees necessary to place in operation a permanent, national SNF

repository. DOE was obligated to periodically review the fund balance and to propose any adjustment to the 1 mil/kwh fee to accomplish the objectives of NWPA. 10 C.F.R. § 961.11, Art. VIII.A.4. Since the initiation of the 1 mil/kwh fee approximately twenty years ago, DOE has not adjusted the fee, notwithstanding that the current balance and continued collection of the fee will result in a significant over-funding of the program. Specifically, the Nuclear Waste Fund balance as of May 1998 of approximately $8 billion, not including the interest to be accumulated thereon through 2010, was twice the amount necessary to fully fund the entire nuclear waste program spending plan as announced by the DOE in May 1998. Nonetheless, the 1998 DOE Plan projected that DOE would continue to collect fees from the Standard Contract holders at the existing 1 mil/kwh fee rate through at least 2010, which would perpetuate aggregate collections into the Nuclear Waste Fund of in excess of $600 million annually.

33. The Standard Contract provides that DOE "will annually review the adequacy of the fees and adjust the 1 mil/kwh fee, if necessary, in order to assure full recovery by the Government." 10 C.F.R. § 961.11 Art. VIII.A.4. The nuclear waste program expenditures contemplated by the 1998 DOE Plan to complete Yucca Mountain by 2010 would be fully funded, without any further collections of the 1 mil/kwh fee from utilities, by the then-existing Nuclear Waste Fund balance, and would in fact leave a balance in 2010 in excess of $4 billion, even disregarding the substantial interest that would accrue to existing Nuclear Waste Fund balances between1998 and 2010. Nonetheless, the 1998 DOE Plan signaled DOE's intention to continue fee collections at the 1 mil/kwh rate. DOE continues to collect Nuclear Waste Fund fees from the Standard Contract holders at the 1 mil/kwh rate to this day.

34. The 1998 DOE Plan acknowledged that DOE intended to collect Nuclear Waste Fund fees in excess of those authorized by NWPA, and to divert a major portion of the Nuclear Waste Fund fee payment that would otherwise be due and payable for purposes as set forth in the NWPA. The 1998 DOE Plan explicitly contemplated that fee collections at the rate projected in the plan would exceed DOE's programmatic requirements to such extent that between $2.8 billion and $5 billion which would otherwise inure to the Nuclear Waste Fund could be used to defray costs incurred by nuclear utilities to mitigate the consequences of DOE's failure to commence SNF disposal by the January 31, 1998 date specified in the NWPA and the Standard Contract. While that portion of the 1998 DOE Plan proposing diversion of Nuclear Waste Fund fee payments was never put into effect, it confirms DOE's intention to assess and collect Nuclear Waste Fund fees in excess of those required for a statutorily compliant program.

35. After the publication of the 1998 DOE Plan, it was clear to prospective buyers of nuclear generating facilities, including the Nuclear Stations, which were themselves Standard Contract holders for plants that they already owned, that they should factor the continuing fee payments announced in the 1998 DOE Plan into their valuation models and reduce their purchase prices accordingly.

36. DOE's imposition of continuing fee payments adversely affected the market value of the Nuclear Stations. On information and belief, prospective buyers of nuclear-generating plants, including the Nuclear Stations, factored the continuing fee payments into their valuation models and reduced their purchase prices accordingly.

37. Pursuant to both the Act and the Standard Contract, DOE was required to begin accepting nuclear waste by a date certain – January 31, 1998 – in

consideration of the payments received by DOE. The Standard Contract provides that "[t]he services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF has been disposed of." 10 C.F.R. § 961.11, Art. II.

38. Execution of the Standard Contract was mandatory for generators of high-level nuclear waste. NWPA provided that commercial nuclear plant owners or operators seeking an operating license from the NRC shall not have such license issued or renewed to them by NRC unless these owners or operators have signed the Standard Contract. 42 U.S.C. § 10222(b)(1)(A). NWPA also requires that holders of nuclear-generating licenses issued by the NRC shall not be entitled to dispose of SNF either through DOE's federal repository program or through any other means or facility, without first having executed the Standard Contract.

39. On June 1, 1983, PECO entered into the Peach Bottom Standard Contract and signed on behalf of the joint owners of Peach Bottom. On June 13, 1983, PSEG entered into both the Salem and Hope Creek Standard Contracts on behalf of the joint owners of Salem and Hope Creek respectively. As a minority owner of the Nuclear Stations, Atlantic was an intended beneficiary of each of the Standard Contracts covering the nuclear units that comprise the Nuclear Stations. Each of the above referenced Standard Contracts, with minor variations, states that it was being entered by the signatory "acting on its own behalf as managing utility . . . and on behalf of the joint owners . . . Atlantic City Electric Company."

40. Atlantic has fully and timely complied with all of the requirements of NWPA and the Standard Contract, including paying in excess of $7.9 million into the Nuclear Waste Fund. DOE, however, did not begin acceptance of Atlantic's SNF by

January 31, 1998, as required by NWPA and the Standard Contract. DOE has not commenced removal of the SNF at the Nuclear Stations or at any of the country's nuclear facilities to this day.

**DOE'S FAILURE TO COMPLY WITH ITS STATUTORY OBLIGATIONS**

41. In the two decades since the enactment of NWPA, DOE has failed to develop and implement the SNF disposal program that Congress defined as a "national priority."

42. In 1987, Congress designated Yucca Mountain, Nevada as the only candidate site eligible for permanent status as a repository to store high-level radioactive waste and SNF. DOE was obligated to develop a schedule for the construction and operation of the Yucca Mountain repository and publish terms and conditions for acceptance and removal of SNF that are compliant with NWPA. 42 U.S.C. §§ 10131(b)(1), 10222(a)(6).

43. Despite its express statutory and contractual obligations, DOE failed to timely adhere to many of the requirements established by NWPA and the Standard Contract. These failures had a significant negative impact on DOE's ability to adhere to a program schedule, particularly as it related to the establishment of a geological repository for the disposal of SNF. Nevertheless, DOE continued to assess and collect Nuclear Waste Fund fees from nuclear generators of SNF, including Atlantic.

44. Through at least 1995, DOE represented that it would begin to accept SNF by the statutory deadline of January 31, 1998. Although DOE knew it was falling behind schedule, it did not develop contingency plans to meet the January 31, 1998 deadline.

45. In 1995, DOE published a "Final Interpretation of Nuclear Waste Acceptance Issues" ("Final Interpretation") in the Federal Register. The Final Interpretation purported to disclaim DOE's obligations under NWPA (and the Standard Contract), stating that DOE was not obligated to begin accepting SNF by January 31, 1998 because it did not have an SNF repository.

46. Several nuclear generators sought review of the Final Interpretation in the U.S. Court of Appeals for the District of Columbia Circuit. The D.C. Circuit held that NWPA imposed an unconditional obligation on DOE to begin accepting SNF on or before January 31, 1998. *Ind. Mich. Power Co. v. Dep't of Energy*, 88 F.3d 1272 (D.C. Cir. 1996). The court found that DOE's obligations were reciprocal to the obligation of the nuclear generators to pay fees into the Nuclear Waste Fund. The court rejected DOE's Final Interpretation and stated:

> DOE's duty under subsection (B) to dispose of the SNF is conditioned on the payment of fees by the owner and is triggered, at the latest, by the arrival of January 31, 1998. Nowhere, however, does the statute indicate that the obligation established in subsection (B) is somehow tied to the commencement of repository operations referred to in subsection (A). . . . Under the plain language of the statute, the utilities anticipated paying fees "in return for [which] the Secretary" had a commensurate duty. She was to begin disposing of the high-level radioactive waste or SNF by a day certain.

*Id.* at 1276.

47. Notwithstanding the court's ruling, in late 1996, DOE, for the first time, officially acknowledged in letters sent to all Standard Contract holders that it would not meet the statutory and contractual deadline of January 31, 1998 to begin acceptance and removal of SNF from the nation's nuclear facilities. DOE maintained that its failure to meet the statutory January 31, 1998 deadline was excused under the terms of the Standard Contract because its delay was "unavoidable." DOE took no

note, and in fact ignored, the reciprocity between its obligation to commence disposal by January 31, 1998 and the Standard Contract holders' obligation to pay fees that were at the heart of the court's ruling in *Indiana Michigan*.

48. As a result, several nuclear facility owners filed a petition for a writ of mandamus to compel DOE to comply with the court's earlier mandate in *Indiana Michigan. N. States Power Co. v. United States Dep't of Energy*, 128 F.3d 754 (D.C. Cir. 1997). The D.C. Circuit reiterated DOE's unconditional statutory obligation to begin accepting SNF on or before January 31, 1998 and issued a writ of mandamus barring DOE from asserting that its failure to meet the January 31, 1998 deadline was unavoidable:

> [T]he Department has endeavored to proceed according to Article IX of the Standard Contract, by first informing the parties of its anticipated delay, and then evaluating whether its own delay is "unavoidable." Article IX describes an unavoidable delay as a party's "failure to perform its obligations . . . aris[ing] out of causes beyond the control and without the fault or negligence of the party failing to perform." . . . As we pointed out in *Indiana Michigan*, the NWPA directs DOE to undertake the duty to begin taking the SNF by January 31, 1998, whether or not it has a repository or interim storage facility. DOE cannot now render its obligation contingent, and free itself of the costs caused by its delay, by advancing the same failed position we rejected before.

*Id.* at 759-60.

49. DOE failed to begin accepting SNF as of January 31, 1998 as required by NWPA. Despite conducting congressionally mandated activities pursuant to NWPA for nearly fifteen years and spending in excess of $4.5 billion from the Nuclear Waste Fund by the time a site was required to be operational, DOE had failed to construct and operate an SNF repository by January 31, 1998. Instead, DOE now insists that it will not have an operational facility at Yucca Mountain until 2010, at the earliest. DOE's latest estimate notwithstanding, and contrary to the express requirements of NWPA, DOE has

not established a meaningful or realistic schedule or determined a date certain by which a permanent repository will be operational. Neither had DOE offered an interim plan for the storage of SNF by the time Atlantic closed the sale of the Nuclear Stations, nor has such a schedule been established to this day. Notwithstanding these failures, DOE continued (and continues) to assess and collect the 1mil/kwh fee.

50. Subsequent to January 31, 1998, the owners of several nuclear facilities filed lawsuits in the U.S. Court of Federal Claims (the "COFC") alleging, among other counts, breach of the Standard Contract. DOE maintained that the COFC lacked jurisdiction over the breach of contract claims because the "Disputes" clause in the Standard Contract required the petitioners to first proceed through an administrative process. The U.S. Court of Appeals for the Federal Circuit ultimately ruled that the COFC was an appropriate forum for such claims. *See Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000); *N. States Power Co. v. United States*, 224 F.3d 1361 (Fed. Cir. 2000).

51. The Federal Circuit further ruled that DOE's failure to begin acceptance of SNF by January 31, 1998 amounted to a violation of the Act (and a breach of the Standard Contract), and that the COFC was an appropriate forum for such claims against DOE. *See id*. The court stated, in pertinent part:

> In brief, we hold that the unavoidable delays provision [in the Standard Contract] deals with delays arising after performance of the contract has begun, and does not bar a suit seeking damages for the government's failure to begin performance at all by the statutory and contractual deadline of January 31, 1998.

*Northern States Power*, 224 F.3d at 1367.

**52.** To date, sixty-six cases have been filed in the COFC against DOE related to its failure to meet its obligations under the NWPA and the Standard Contract,

predominately by the existing owner/operators of nuclear facilities seeking damages related to ongoing SNF storage costs. As a seller of a nuclear facility, Atlantic is seeking just compensation for the government's wrongful taking which caused substantial economic harm to Atlantic, including a drastic reduction in the value of the Nuclear Stations, diminished value of the Standard Contract, and other related costs incurred up to the closing date of the sale. In addition, Atlantic was an intended beneficiary under the Standard Contracts for the Nuclear Stations at the time of DOE's breach on January 31, 1998, and subsequently sold the Nuclear Stations under circumstances which were profoundly affected, influenced, and altered by the DOE breach. As an intended beneficiary under the Standard Contract at the time of the DOE breach, Atlantic seeks damages directly and proximately caused by the DOE breach, including DOE's Nuclear Waste Fund fee assessment practices, as measured by the diminished value Atlantic realized in the sale of the Nuclear Stations, diminished value of the Standard Contract, and other related costs incurred up to the closing date of Atlantic's sale of the Nuclear Stations as a result of DOE's failure to meet its obligations under the Standard Contract.

**THE NUCLEAR STATIONS**

53. The Nuclear Stations are comprised of the Salem 1 and 2, Hope Creek, and Peach Bottom 2 and 3 nuclear electric-generating facilities. Salem 1 and 2 were issued operating licenses by the NRC in August, 1976 and April 1980, respectively; Hope Creek, in April 1986; and Peach Bottom 2 and 3, in August, 1973 and July 1974, respectively. Atlantic's capacity interests in Salem 1 and 2, Hope Creek, and Peach Bottom 2 and 3 are 164MWs, 52MWs, and 164MWs, respectively.

54. As Salem, Hope Creek, and Peach Bottom were designed, constructed, and became commercially operational prior to the enactment of NWPA, all SNF

produced at these facilities was expected to be shipped off-site for reprocessing following each refueling outage. As a result, the need for significant on-site storage capacity was not contemplated for these facilities. With the adoption of NWPA, and the elimination of SNF reprocessing, Atlantic was compelled to rely on the federal government to accept and dispose of its SNF in accordance with the Act.

## SALE OF THE NUCLEAR STATIONS

55. On February 9, 1999, the Governor of New Jersey signed the Electric Deregulation and Energy Competition Act, N.J. Stat. Ann. § 48:3-49 *et seq.*, which authorized NJBPU to permit competition in the electric generation marketplace and to adopt appropriate standards for the divestiture of generation assets.

56. In response, Atlantic determined to offer the Nuclear Stations for sale through a competitive auction. Ten potentially qualified bidders expressed an interest in participating in the auction.

57. Pursuant to the joint owners' agreements with Atlantic, PSEG and PECO maintained a right to match any offer that was made for the Nuclear Stations. PSEG and PECO subsequently submitted offers for the Nuclear Stations outside of the auction process. The PSEG and PECO offers were conditioned upon Atlantic's suspension of the auction process pending the outcome of negotiations with PSEG and PECO regarding their offers. On information and belief, only two of the eligible bidders would have submitted bids for the Nuclear Stations had the auction not been suspended, and neither of those bids would have been as favorable as the PSEG and PECO offers.

58. The PSEG and PECO offers did not require Atlantic to top-off its decommissioning trusts. As a result of this (and other factors), Atlantic determined to

suspend the auction process and entered into exclusive negotiations with PSEG and PECO for the sale of the Nuclear Stations.

59. On September 27, 1999, Atlantic entered into Purchase and Sale Agreements with PSEG and PECO for the respective interests in the Nuclear Stations, which subsequently received all requisite state approvals to effectuate the sale.

60. Atlantic also purported to transfer its claims associated with DOE's breach of the Standard Contract. Atlantic maintains that the transfer of those claims was proper.

61. The Government, in its November 4, 2004 Reply to Plaintiff's Response to Defendant's Cross-Motion for Summary Judgment on Liability in *Entergy Nuclear Generating Co. v. United States*, No. 03-2626C (Fed. Cl. filed on Nov. 4, 2004), has asserted that sellers were "statutorily barred from assigning any pre-existing damages claims." *Id*. at 2. In support of this argument, DOE has cited the Assignment of Claims Act, 31 U.S.C. § 3727, which it argues "generally governs and limits the ability of Government contractors to assign their claims against the Government." *Id*. The Government has asserted that while the NWPA provides for the assignment of the Standard Contract, it does not provide for assignment of pre-existing claims arising under the Standard Contract. *Id*. at 3. Further, DOE cites to the Federal Circuit's holding in *Ginsberg v. Austin*, 968 F.2d 1198 (Fed. Cir. 1992), for the proposition that pre-existing claims are not transferred automatically with an assignment of contract. *Id*. at 5. According to DOE's analysis of the relevant statutory and case law, any purported assignment of pre-existing claims attempted to be made in the September 27, 1999 Purchase and Sale Agreements with PSEG and PECO was invalid. To the extent that the Court concurs with DOE on this point, and does not agree with Atlantic that its

transfer of claims is valid, Atlantic hereby asserts claims for breach of contract and breach of the duty of good faith and fair dealing.

**CONTRACT DAMAGES SUFFERED BY ATLANTIC**

62. When on January 31, 1998 DOE reneged on its sixteen-year old statutory and contractual obligations to commence disposal of SNF, this failure on DOE's part to perform significantly diminished the value of the Nuclear Stations and the value of the Standard Contract. When the Nuclear Stations were divested, this diminished value was reflected in the auction process, and ultimately in the terms and conditions of sale for otherwise extremely valuable electric-generating assets. DOE's failure to timely and completely fulfill its mandates under NWPA and its commitments under the Standard Contract directly resulted in such prospective purchasers, as were actually willing to entertain acquisition of nuclear electric generating facilities such as the Nuclear Stations to account for the increased costs, risks, and uncertainties brought about by DOE in their respective valuations of the asset.

**DIMINISHED VALUE REALIZED BY ATLANTIC**

63. DOE's failure to perform its statutory and contractual obligations to remove SNF caused a number of potential purchasers for nuclear electric-generating facilities such as the Nuclear Stations to be artificially and improperly constrained, thereby reducing the beneficial effects of a competitive auction for these assets. Due to the increased risk and anticipated expense associated with storing SNF on-site indefinitely, potential buyers elected not to participate in the sales process for the Nuclear Stations, thereby shifting market power to a limited universe of potential buyers who were prepared to entertain assumption of SNF risks in the face of DOE's defaults. Had DOE been performing its SNF obligations, Atlantic would have received

the benefits of a more competitive sales process, and the perceived future economic benefits of the Nuclear Stations as a source of electric sales revenues would have been significantly greater and more assured. However, DOE's failure to perform resulted in Atlantic receiving less value for the Nuclear Stations than it would and should have received had DOE fulfilled its statutory and contractual SNF disposal obligations.

64. DOE's failure to meet its obligations under NWPA and the Standard Contract diminished the market value of the Nuclear Stations and the value of the Standard Contract because the remaining useful economic life of the facilities could not be determined. Absent a place to store the SNF or the confidence that DOE would fulfill its statutory and contractual obligations at any particular time, if ever, the continued operation of the plant for any significant period would not be possible. As a result, the value of the plants were substantially depleted, since the future prospects of electric sales revenues were uncertain. The value of the plants were also diminished because the re-use value of the sites will be deferred indefinitely until decommissioning and SNF removal are complete. Prospective purchasers of the Nuclear Stations reflected these limitations on prospects for assured future operation and re-use in their value assessments.

**65.** When PSEG and PECO submitted their bids for the Nuclear Stations, they knew that they would need to install costly on-site dry cask storage facilities in order to continue commercial operation of the Nuclear Stations beyond the end of their current operating license periods. There is no certainty to obtaining the necessary local and federal permits for a dry cask storage facility.

**66.** Dry cask storage involves the construction of a large facility at the nuclear plant site within which SNF that has been removed from wet storage and

placed in enormous casks weighing up to 100 tons each will be stored. The pursuit of a campaign to utilize dry cask storage technology at a particular site involves the design, local and federal permitting, and construction of the actual storage facility, equipment procurement and installation, and extensive procedure development and personnel training. A dry cask storage facility can take up to five years or longer to complete and make operational, assuming that all objections can be overcome and permits obtained, and can cost in the tens of millions of dollars. Each separate cask utilized in a dry cask storage facility costs approximately $1 million, with the initial cask order for a facility of the Nuclear Stations' size typically being more than a dozen casks. Further, at the time of the Nuclear Stations' sales, there was no assurance that such a facility would be approved, whether capacity would be restricted, or as to what the nature of any permit or license conditions imposed and associated costs might be.

**67.** On information and belief, the costs and risks associated with installing dry cask storage facilities the Nuclear Stations were included in PSEG and PECO's valuations, and had the direct effect of reducing the prices that these companies paid for the facilities. On information and belief, PSEG and PECO also factored into their valuations and reduced their prices for the Nuclear Stations to reflect the additional expenses associated with on-site storage of SNF, including the continuation of payments into the Nuclear Waste Fund.

68. Under the Standard Contract, DOE was entitled to assess and collect, and the Standard Contract holder was obligated to pay into the Nuclear Waste Fund, only such fees as were authorized by NWPA. By the time of the Nuclear Stations' sales transactions, it was evident to potential buyers that DOE intended, and had already begun, to disregard the fee provisions of the Standard Contract, and instead continued

to assess and collect amounts in excess of those authorized by NWPA and the Standard Contract. The 1998 DOE Plan made it clear that DOE intended to continue the over-collection of fees essentially indefinitely. However, the Standard Contract does not authorize DOE: a) to collect amounts to support DOE's breach of its obligations well into the 21st Century; b) to anticipate its liability as would ultimately be determined by the COFC and to embark upon a program of pre-collecting such amounts from Standard Contract holders; c) to pre-collect funds to repay or support operations damaged by DOE's failure to remove SNF; or d) to collect from and assign to Standard Contract holders cost responsibility for DOE's cost overruns associated with a noncompliant and significantly delayed waste disposal program. Notwithstanding this lack of authorization, DOE engaged in just such activities, which deprived Atlantic of the value of its assets and its entitlements under the Standard Contract, and, contrary to the provisions of the Standard Contract, improperly required Atlantic as a beneficiary under the Salem, Hope Creek and Peach Bottom Standard Contracts, to suffer the financial consequences of DOE's unauthorized actions.

69. On information and belief, PSEG and PECO factored into their valuations and reduced their prices for the Nuclear Stations to reflect all known and anticipated additional expenses associated with on-site storage of SNF and future Nuclear Waste Fund fees announced by DOE in the 1998 DOE Plan.

**JUST COMPENSATION DUE ATLANTIC**

70. DOE's failure to commence acceptance and disposal of SNF on January 31, 1998 significantly diminished the values of the Nuclear Stations and the Standard Contract. When the Nuclear Stations were divested, these diminished values were reflected in the auction process, and ultimately in the terms and conditions of sale

for otherwise extremely valuable electric-generating assets. DOE's failure to fulfill its mandates under NWPA and the Standard Contract directly resulted in such prospective purchasers, as were actually willing to entertain acquisition of nuclear electric-generating facilities such as the Nuclear Stations, to account for the increased costs, risks, and uncertainties brought about by DOE in their respective valuation of the assets.

71. As a direct and proximate result of DOE's failure to perform its statutory obligations, Atlantic suffered significant damages. These damages fall into two general categories, namely: (a) significant diminution in the market value for the Nuclear Stations and diminution in the value of the Standard Contract which caused Atlantic to realize significantly less value in the sale of the Nuclear Stations than would have been the case had DOE met its obligations under NWPA; and (b) increased costs and expenditures incurred by Atlantic up to the closing dates of Atlantic's sale of the Nuclear Stations to store and maintain SNF, and other related costs.

72. The market value of the Nuclear Stations prior to DOE's failure to meet its statutory obligations under NWPA was significantly greater than it was immediately following that failure, and at the time of Atlantic's sale of the Nuclear Stations. This diminution in market value was a direct and proximate result of DOE's failure to fulfill its NWPA statutory mandates.

73. Indicative of the decreased market value, Atlantic's compensation for the sale of the Nuclear Stations was substantially less than it would have been had DOE fulfilled its statutory obligations to begin acceptance and removal of SNF commencing on January 31, 1998. DOE's failure to perform its statutory obligations under NWPA caused the market opportunities for nuclear-generating facilities, such as the Nuclear

Stations, to be artificially constrained, thereby reducing the beneficial effects of a competitive auction for these assets. At the time of the sale of the Nuclear Stations, DOE had not provided a commitment to the nuclear-generating industry as to when, if ever, it would begin accepting SNF. Potential buyers elected not to participate in the sales process for the Nuclear Stations due to the increased risk and anticipated expense associated with storing SNF on-site indefinitely. This caused a failure of the bidding process, the effect of which was to constrain competition and diminish the fair market value of the Nuclear Stations. Had DOE properly performed its statutory obligations under the Act, more bidders would have competed in the sale of the Nuclear Stations, which would have enhanced competition and resulted in a far higher price for the Nuclear Stations.

74. Pursuant to NWPA, DOE was entitled to assess and collect (and nuclear-generating facility owners such as Atlantic were obligated to pay) only such fees as were authorized by NWPA. By the time of the Nuclear Stations' sales transactions, it was evident to potential buyers that DOE intended, and had already begun, to disregard the fee provisions of NWPA and instead to assess and collect amounts in excess of those authorized by NWPA and the Standard Contract. The 1998 DOE Plan made it clear that DOE intended to continue the over-collection of fees indefinitely. However, NWPA did not authorize DOE: a) to collect amounts to support DOE's breach of its obligations well into the 21st Century; b) to anticipate its liability as would ultimately be determined by the courts and to pre-collect such amounts; c) to pre-collect funds to repay or support operations damaged by DOE's failure to remove SNF; or d) to collect from and assign to companies, such as Atlantic, cost responsibility for DOE's cost overruns associated with a noncompliant and significantly delayed

waste disposal program. Notwithstanding this lack of authorization, DOE engaged in just such activities, which deprived Atlantic of the value of its assets, and, contrary to the provisions of NWPA, improperly required Atlantic to suffer the financial consequences of DOE's unauthorized actions.

75. The market value for the Nuclear Stations and the value of the Standard Contract were significantly diminished by DOE's failure to meet its statutory obligations under NWPA because the buyers, PSEG and PECO, drastically reduced their price to account for the increased risks and costs associated with indefinite SNF on-site storage and the anticipated post-closing costs to store SNF and continue to operate the plants.

## COUNT I

## BREACH OF CONTRACT

76. Atlantic repeats and re-alleges here all the allegations as set forth in paragraphs 1 through 75 above.

77. The Standard Contract creates unconditional obligations on DOE to begin accepting Atlantic's SNF by January 31, 1998. In consideration thereof, Atlantic paid over $7.9 million into the Nuclear Waste Fund.

78. DOE has failed to perform its obligations under the Standard Contract to begin accepting SNF by January 31, 1998 (and has not done so to this day). DOE's failure to do so constitutes a breach of the Standard Contract for which Atlantic is entitled to damages.

79. DOE's breach of the Standard Contract severely diminished the market value of Atlantic's nuclear facilities as reflected in the purchase price and

diminished the value of the Standard Contract. Atlantic also incurred additional pre-closing costs and other damages associated with the interim storage of SNF.

**COUNT II**

**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

80. Atlantic repeats and re-alleges here all the allegations as set forth in paragraphs 1 through 79 above.

81. The Standard Contract contains an implied covenant of good faith and fair dealing. This covenant requires DOE to cooperate with Atlantic and to reasonably and in good faith perform its duties under the Standard Contract and not to take actions that are detrimental to Atlantic's contractual rights.

82. DOE has breached the implied covenant of good faith and fair dealing by failing to take appropriate action to meet its contractual commitment to begin accepting Atlantic's SNF for disposal by January 31, 1998. Prior to the closing date of Atlantic's sale of the Nuclear Stations (and to this day), DOE failed to provide a commitment as to when, if ever, it would accept SNF for disposal.

83. As a direct and proximate result of DOE's breach of the implied covenant of good faith and fair dealing, Atlantic has suffered damages as alleged above.

**COUNT III**

**UNCOMPENSATED TAKING**

84. Atlantic repeats and re-alleges here all the allegations as set forth in paragraphs 1 through 83 above.

85. DOE was unconditionally obligated under NWPA to begin acceptance of Atlantic's SNF by January 31, 1998. NWPA conferred upon Atlantic a right to have

DOE dispose of Atlantic's SNF in a manner and at a cost consistent with the intent of Congress.

86. DOE's failure to dispose of Atlantic's SNF by January 31, 1998 as required by the Act deprived Atlantic of the full use and value of its nuclear facilities, caused it to incur substantial unnecessary capital and other expenses, and severely diminished the value of these facilities and the Standard Contract. This failure constitutes a taking of Atlantic's vested property rights without just compensation.

87. Atlantic possessed a protected property interest in the benefits of NWPA, including paying into the Nuclear Waste Fund only what the statute authorizes. DOE's disregard of this interest and its continued collection after January 31, 1998 of amounts in excess of those authorized by NWPA resulted in a systematic and unreasonable over-collection of those fees. This action constitutes a taking of Atlantic's property in violation of the Fifth Amendment to the U.S. Constitution.

88. In the alternative, Atlantic was an intended beneficiary of the Standard Contract at all relevant times prior to and including January 31, 1998. Under the Standard Contract, DOE was obligated to accept and/or dispose of Atlantic's SNF. Accordingly, as an intended beneficiary to the Standard Contract, Atlantic possessed property rights to have DOE dispose of Atlantic's SNF in a manner and at a cost consistent with the express terms of the Standard Contract. DOE's failure to commence taking custody of Atlantic's SNF by January 31, 1998, as required by the Standard Contract, deprived Atlantic of the full use and value of its nuclear facilities, caused it to incur substantial unnecessary capital and other expenses, and severely diminished the value of these facilities and the Standard Contract. This failure constitutes a taking of Atlantic's vested property rights without just compensation.

Moreover, DOE's actions in continuing to collect Nuclear Waste Fund payments from utilities, including Atlantic, beyond that which was necessary to put a permanent national nuclear waste repository in place by January 31, 1998 constitutes a further taking of Atlantic's property rights.

89. DOE's failure to abide by its obligations with respect to SNF has destroyed Atlantic's reasonable, investment-backed expectations arising from NWPA. DOE's conduct has deprived Atlantic of the full economic use of its nuclear facilities, Standard Contract, and related property, and reduced the tangible and intangible value of the Nuclear Stations as going concerns.

90. DOE's failure to perform its statutory responsibilities were clearly aimed at, and intended to benefit, the general public's interest at the expense of Atlantic. DOE was obligated to undertake the exercise of proper procedures to ensure due process and the calculation of just compensation from the date of taking. DOE failed to exercise those procedures and failed to provide just compensation.

91. By reason of the foregoing, DOE has taken Atlantic's property in violation of the Fifth Amendment to the U.S. Constitution and is liable to Atlantic for just compensation.

## PRAYER FOR RELIEF

WHEREFORE, Atlantic respectfully requests that the Court enter judgment in its favor and against the United States as follows:

(1) On Count I, for damages in an amount to be established at trial;

(2) On Count II, for damages in an amount to be established at trial;

(3) On Count III, for just compensation in an amount to be established at trial;

(4) Pre-judgment and post-judgment interest as permitted by law;

(5) Costs of suit, including reasonable attorneys' fees, as permitted by law; and

(6) Such other and further relief as this Court may deem proper.

Date: December 2, 2004

Respectfully submitted,

/s/ Richard J. Conway
Richard J. Conway
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, N.W.
Washington, D.C. 20037
(202) 785-9700

*Counsel of Record for*
*Atlantic City Electric Company*

Of Counsel: David M. Nadler
Nicholas W. Mattia, Jr.
Bradley D. Wine
DICKSTEIN SHAPIRO MORIN
& OSHINSKY LLP
2101 L Street, N.W.
Washington, D.C. 20037
(202) 785-9700

Todd L. Goodman
CONECTIV
P.O. Box 231
Wilmington, DE 19899-0231
(302) 429-3786