LEXSEE 48 FR 16590

DEPARTMENT OF ENERGY

AGENCY: Department of Energy.

10 CFR Part 961

Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste

*48 FR 16590*

April 18, 1983

ACTION: Final rule.

SUMMARY: This rule establishes a standard contract to be used by the Department of Energy (DOE) in furnishing disposal services to the owners or generators of spend nuclear fuel and/or high-level radioactive waste and procedures to implement the Nuclear Waste Policy Act of 1982. Section 302 of that Act requires DOE and the owners or generators of spent nuclear fuel and/or high level radioactive waste to execute, by June 30, 1983, a contract under which DOE will accept and dispose of such material. This rule sets forth the contractual terms and conditions under which DOE will make available the nuclear waste disposal services.

EFFECTIVE DATE: April 18, 1983.

FOR FURTHER INFORMATION CONTACT:

Robert Rosselli, Nuclear Waste Policy, Act Project Office, Department of Energy, Room 7B-084, Washington, D.C. 20585 (202) 252-6842;

James Cavanagh, Office of Policy, MA-421.1, Procurement and Assistance, Management Directorate, Department of Energy, Room 8H-057, Washington, D.C. 20585 (202) 252-8188;

Elliot Winnick, Office of General Counsel, Department of Energy, Room 6B-190, Washington, D.C. 20585 (202) 252-1526.

**TEXT:** SUPPLEMENTARY INFORMATION:

I. Legislative Background.

II. Public Hearing.

III. Written Comments.

IV. Final Rule.

V. Procedural Requirements.

I. Legislative Background

Under Section 644 of the Department of Energy Organization Act (Pub. L. 95-91, 91 Stat. 565, *42 U.S.C. 7254),* the Secretary of the Department is authorized to prescribe such rules and regulations as he may deem necessary or appropriate to effectuate the functions vested in him.

The Nuclear Waste Policy Act of 1982, enacted on January 7, 1983, (hereinafter referred to as "the Act," Pub. L. 97-425, 96 Stat. 2201, *42 U.S.C. 10101 et seq.* ) provides a comprehensive framework for disposing of spent nuclear fuel

(SNF) and high-level radioactive waste (HLW), of domestic origin, generated by civilian nuclear power reactors. Among other things, the Act establishes procedures for selecting repository sites and developing repositories for SNF and HLW, authorizes the establishment of such repositories and provides a mechanism for financing the cost of disposal of such material.

On February 4, 1983, pursuant to Section 302(a) of the Act, DOE published its proposed rule *(48 FR 5458)* which set forth the proposed contract for disposal of spent nuclear fuel and/or high-level radioactive waste.

In the "Legislative Background" section of the proposed rule *(48 FR 5458-5459)* an interpretation was set forth that an affirmation by the Secretary, in writing, that an owner or generator of SNF or HLW is actively negotiating in good faith would defer the preclusion of disposal of SNF or HLW in the absence of a timely executed contract. This interpretation was reflected in the last sentence of § 961.2 of the proposed rule *(48 FR 5461),* which stated that "[t]hese deadlines may be waived if the Secretary of Energy affirms in writing, in accordance with section 302(b)(1)(A)(ii) of the Act, before the applicable deadline, that the owner or generator is actively and in good faith negotiating with the Secretary for a contract covered by this part." The interpretation has been reconsidered and the Department has concluded that the requirement that a contract be entered into not later than June 30, 1983 or the date on which an owner or generator commences generation of, or takes title to, SNF or HLW (whichever occurs later) cannot be deferred by a Secretarial affirmation. Accordingly, the above quoted last sentence of § 961.2 has been deleted.

II. Public Hearing

On March 3, 1983, pursuant to the notice contained in the aforesaid proposed rule, a public hearing was held before DOE in Washington, D.C. Oral presentations were made by representatives of two nuclear utilities, two nuclear fuel vendors and an engineering firm. A transcript of this hearing on the proposed rule was made and is available in the DOE Reading Room, Room 1E-190, Forrestal Building, 1000 Independence Avenue, SW., Washington, D.C.

III. Written Comments

In addition to comments received at the aforesaid public hearing, written comments on the proposed rule were received by March 7, 1983, from a total of 85 organizations representing electric power associations (whose members include nuclear power utilities), nuclear power companies, environmental organizations and consumer protection associations, State and Federal agencies as well as individual members of the public. Copies of all comments received are available in the DOE Reading Room referenced in Section II above.

All comments received by DOE in response to its proposed rule of February 4, 1983, both at the public hearing and the written comments received thereafter, were carefully reviewed and fully considered in the formulation of this final rule. A summary of the substantive comments received by DOE is set forth below together with Department's action regarding those comments.

*A. Areas of Primary Interest*

Most of the public comments received on the proposed rule fall into six areas (discussed below in Section III.B.), as follows:

(1) *Fees to be charged;*

(a) electricity generated on and after April 7, 1983 (1M/KWH); (b) one-time fee for discharged spent fuel; (c) one-time fee for in-core burned fuel. (see contract Article VIII.A. discussed in Section III.B. below)

(2) *Payment Options* (see contract Article VIII.B. in Section III.B. below)

(3) *Priority Acceptance Ranking* (see contract Article VI.B. in section III.B. below)

(4) *Exchange Rights* (see contract Article V.E. in Section III.B. below)

(5) *Audit Rights for Purchasers* (see contract Article IV.B.5(b) and discussion in Section III.C. below)

(6) *Contract Appendices* (see Appendices A through F in Section III.B. below)

*B. Sectional Analysis of Contract*

The standard contract set forth in this final rule remains essentially the same as that described in the proposed rule published on February 4, 1983 (see *48 FR 5459-60).* As described more fully below, various contractual provisions were revised, and others were deleted or added. In addition, six clauses that were previously contained in an Appendix of General Provisions in the proposed rule (Appendix H, *48 FR 5471)* have been made part of the contract document itself and now appear as Articles XVI-XXI in the standard contract set out in this final rule.

Specific revisions in the proposed contract published previously, as they were made in the contract set out in this final rule, are as follows:

*Recitals*

In the first paragraph identifying the signatory parties, the parenthetical phrase,"(hereinafter referred to as the 'Purchaser')," was moved for clarity directly after the Purchaser's name. Also, as suggested by several commenters and recognizing that the Purchaser could represent several corporate entities having ownership rights in a particular reactor facility, the words, "acting on behalf of itself and [others]," may be added, as applicable, after "Purchaser."

The first "Whereas" clause was slightly revised to conform with the wording used throughout the contract so that the words "spent nuclear fuel" precede the words "high-level radioactive waste."

A new second "Whereas" clause, relating to the responsibility of DOE to take title to SNF or HLW "as expeditiously as practicable," has been added to follow the language of the Act ( § 302(a)(5), *42 U.S.C. 10222*(a)(5)).

In the fourth "Whereas" clause, the words "from any Purchaser" have been replaced with the words, "from owners and generators" to conform with the Act.

Article I — Definitions

Some commenters requested that the "assigned three-month period" (Article I.1) be made by mutual consent rather than unilaterally by DOE. This suggestion was partially adopted by modifying this definition.

Twelve commenters recommended that the definitions of "Commission" and "DOE" (Article I, paragraphs 4 and 10) be modified to include successor agencies. Such a modification is unnecessary for two reasons. First, the Purchaser is not contracting, as such, with DOE, but rather with "the United States of America . . . *represented by* the U.S. Department of Energy." Second, any new agency or Department established by a legislative reorganization would, we believe, succeed by operation of law to the functions and responsibilities previously vested in the abolished agency or department (see Energy Reorganization Act, of 1974, Pub. L. 93-438, section 301, *42 U.S.C. 5871;* Department of Energy Organization Act, Pub. L. 95-91, § 301, *42 U.S.C. 7151).* Accordingly, DOE has not adopted this suggested change.

Several commenters requested that the definition of SNF (Article I.18) be clarified to state that fuel temporarily removed from, and planned to be reinserted into, the reactor not be considered SNF. To address this aspect of temporarily removed fuel, DOE has revised the reporting requirements regarding discharged fuel (see Article V and Appendix B). However, the definition of SNF was not revised as it is taken directly from the Act itself *(42 U.S.C. 10101*(23)).

The definition of "delivery commitment" which appeared in the proposed rule *(48 FR 5462,* Article I.7) has been deleted as this aspect is adequately covered in the contract itself (See Articles IV and V).

In the definition of "delivery" (Article I.7), the words "f.o.b. carriers" have been added to reflect the intent of the parties and to accord with the applicable contract provision (See Article VI. B. 1).

The definition of "DOE facility" (Article I.10) was expanded to expressly state, in accordance with the Act, that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository.

The definition of "kilowatt hours generated" (Article 1.14) is a substantive change from the definition of the term "Kilowatt Hours Generated and Sold" in the proposed rule. Some commenters noted that the former definition did not account for or adequately reflect the Congressional intent regarding the method of establishing waste disposal charges. The definition in the proposed rule was based upon the premise that the language in Section 302(a)(2) of the Act "for electricity generated by a civilian nuclear power reactor and sold on or after the date 90 days after the date of enactment

of this act," meant to establish disposal charges on the basis of electricity "generated and sold," i.e., the "net" electricity. These commenters pointed out the Section 302(a)(2) of the Act should be read to require establishment of disposal charges based upon the "electricity generated by a civilian nuclear power reactor," i.e., the total or "gross" electricity generated. The Department now believes this to be the proper interpretation of Section 302(a)(2), for the contrary interpretation (i.e., "net" rather the "gross") would unfairly subject future users of electricity (in the rate charges passed on by the Purchaser utility) to increased charges. The words "and sold on or after a date 90 days after enactment", in our view, should be read to establish a date certain for calculation of the Act's differing methods of establishing fees for disposal charges, (i.e., past 90 days after enactment and prior to 90 days after enactment). Accordingly, the contract has been modified to reflect this interpretation.

Other textual changes were made in the definitions numbered "11", "12", "16" and "18" in Article I.

Article II — Scope

This clause was amended to more closely reflect the statutory language found in Section 302(a)(1) of the Act, as well as the fact that the services to be provided would occur in the future. The timing of the services was changed to be consistent with Section 302(a)(5) of the Act.

Article III — Term

To accord with the scope provision (Article II) and with the language of the Act (section 302(a)(1), *42 U.S.C. 1022*(a)(1)), this clause was revised to read that the contract "term . . . shall be free from the date of execution until . . . DOE has accepted, transported . . . and disposed of all SNF and/or HWL . . . ."

Article IV — Responsibilities of the Parties

Paragraph A of this clause, which was formerly Article V in the proposed rule, has been amended to clarify the Purchaser's responsibilities. Information required on actual and projected discharges, which is due beginning October 1, 1983, will be for planning purposes and does not represent a firm commitment regarding deliveries. A further provision states that failure by the Purchaser to comply with the annual requirement for such reports may result in rescheduling of any of the Purchaser's currently approved delivery commitment schedules.

Also, paragraph A.2.(c) was revised to show that the Purchaser is not responsible for routine maintenance on the Government-furnished shipping casks, but will be responsible for incidental maintenance and protection of such casks while they are in its possession and control.

Paragraph B was amended with respect to DOE's responsibilities. The review and approval procedure for delivery schedules was deleted as this is covered elsewhere in the contract (Article V.B. and C.). Language consistent with Section 302(a)(1) of the Act has been added, as well as a paragraph describing DOE's responsibilities regarding furnishing of shipping casks. DOE will provide such casks sufficiently far in advance of scheduled transportation, which will meet applicable regulatory requirements. It will also provide to the Purchaser such information, specifications and training which may be needed to facilitate safe handling and loading. DOE will also provide the Purchaser with specifications necessary to ensure that any Purchaser-furnished cannisters will be compatible with the Government-furnished casks.

In paragraph A.1.(a), a new sentence was added, to be consistent with the express language of the referenced Appendix B (designated Appendix D in the proposed rule), that the information to be furnished by Purchaser is not to be considered a "firm commitment with respect to discharges or deliveries." Other clarifying editorial changes were also made in Article IV.A.

In Article IV.A.2(b), several commenters proposed that the term "delivery date" be used instead of the undefined term "scheduled transportation." This suggested change was not made as DOE considers the present wording sufficiently clear.

In Article IV.A., a number of commenters suggested that the Purchaser's liability under paragraph IV.A.2.(c) is too broad. That paragraph states that the Purchaser is responsible for any loss of or damage to DOE-furnished casks while in the possession and control of the Purchaser. Those commenters said that this provision would hold the Purchaser responsible if the damage was caused by a defect in DOE-furnished property. They also said that the phrase "expenses incidental to such loss or damage" was vague and could include consequential damages.

This recommended change was not adopted because DOE believes that the existing provision is appropriate. Since the casks are furnished by the Government, it is clear that defects in the cask, and any damages resulting therefrom, would

be the responsibility of the Government. Also, the phrase "expenses incidental to such loss or damage" was intended to cover consequential damages and seems sufficiently clear.

Article IV.B.2., relating to DOE's duty to furnish casks to the Purchaser, was revised at the request of numerous commenters. As revised, the provision sets out with more specificity what DOE must furnish together with the casks (procedures, information, tools, etc. as may be needed) and clarifies that Purchaser is required to perform "incidental maintenance," as distinguished from more complete "routine maintenance" which will be performed by DOE.

In addition, at the request of a substantial number of commenters, a new provision has been added as subparagraph IV.B.5(b), which states that DOE will issue "an annual report for planning purposes . . . set[ting] forth the projected annual receiving capacity for the DOE facility."

In Article IV.B.4, one commenter indicated the following words should be added at the end of Article IV.B.4: "or subcontractors, acting solely under the supervision and control of DOE." This suggested revision was not made because the Government would not have privity of contract with subcontractors, who would not be under its supervision and control. The responsibility for supervision and control of subcontractors would clearly be upon the prime contractor who, of course, will ultimately be responsible to the Government.

Article V — Delivery of SNF and/or HLW

This clause was formerly Article IV in the proposed rule. In paragraph A, editorial revisions have been made for purposes of clarification. The first sentence of paragraph B.2 was added to specify the procedure to be followed in the event revised delivery commitment schedules are required (with a similar change in Article V.C.). In the proposed rule, Article V.B. contained a final paragraph relating to changes by the Purchaser in "specific assemblies." This paragraph was deleted as it is now covered by the new provision on "Exchanges" contained in paragraph "E" of Article V, which was adopted at the recommendation of numerous commenters. This new provision allows Purchasers to exchange DOE-approved delivery commitments with one another, subject to DOE approval. While this procedure will allow the Purchaser greater flexibility in arranging its inventory of spent fuel and delivery thereof, all SNF and/or HLW to be delivered must comply with the requirements of the contract regarding acceptability.

Eleven commenters said they found confusing the wording in Article V.B, which provides that "after DOE has issued its proposed acceptance ranking. . . . purchaser shall submit delivery commitment schedules 63 months before proposed delivery date." They suggested that DOE modify this language as follows: ". . . the purchaser shall submit, not later than 63 months prior to the start of any fiscal year, delivery commitment schedules specifying all deliveries that Purchaser wishes to make during that fiscal year." We have not accepted this suggestion. No delivery commitment schedules should be submitted prior to the initial acceptance ranking because DOE would have no basis at that time to approve or disaprove it. Moreover, there is very little chance that the repository will be ready earlier than the planned date of 1998.

Five commenters questioned the lack of a definition for "emergency deliveries," which are covered in Article V.D. We have intentionally not defined the term "emergency delivery" because it is not possible to describe the nature of all emergency situations at this time. One situation which would receive consideration is one in which a delivery is needed to permit licensed reactor operations to continue.

Article VI — Criteria for Disposal

Although certain editorial and clarifying revisions were made in Article VI, it remains substantially the same as set forth in the proposed rule *(48 FR 5463-64).*

Article VI.A.4 establishes special procedures for "other than standard fuel," and ten commenters recommended that only two categories of SNF be used — fuel that has to be canned and fuel that does not. In their view, none of the other categories has any importance in the context of transportation and disposal, and they suggested that this provision be eliminated. We have not accepted this suggestion since there can be "nonstandard" fuel which does not need to be canned; it may just be the wrong size or age.

Article VI.B.2 provides that "improperly described" SNF/HLW will not be transferred by Purchaser to DOE "unless DOE agrees to accept such SNF and/or HLW under such other arrangements as may be agreed to, in writing, by the parties." Nine commenters said that this provision gave DOE unlimited discretion to impose any additional restrictions on such material, and suggested its deletion. We have not accepted this suggestion. In our view, the provision is necessary and appropriate because it provides DOE with a mechanism to protect against improperly described fuel.

Article VI.B.3 establishes two priorities for acceptance of SNF and/or HLW — one based on the age of the SNF/HLW and the second for SNF/HLW from permanently shutdown reactors. Nine commenters stated that no priority is given to utilities who may need to ship SNF to DOE in order to keep their facilities operating, nor is any consideration given to the size of a Purchaser's SNF inventory. They suggested that an allocation system be established whereby half of the receiving capacity to be allotted would be based on the age of SNF/HLW and the remaining half on Purchaser's share of the industrywide inventory. DOE has not adopted this recommendation because by the time the repository commences operation, utilities will have made adequate preparations to provide on-site storage in order to ensure continued plant operations. Any emergency situation can be handled by DOE under the emergency delivery clause. Moreover, it is incorrect to say that DOE does not consider the Purchaser's inventory. By accepting the oldest fuel first, the Department will, in effect, be accepting fuel from utilities with large inventories because those are the utilities with the oldest fuel. A priority system based on the Purchaser's share would be extremely difficult to manage because each Purchaser's share changes continuously as fuel is added to or subtracted from the industry-wide inventory; and DOE would be required to accept fuel each year from the Purchaser until the last power reactor is shut down.

Article VI.B.3.(b) gives priority to SNF/HLW from permanently shutdown reactors, and four commenters recommended that this provision be deleted. This type of priority is necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity. Therefore, we have not accepted the recommendation.

Article VII — Title

This clause remains substantially the same as that shown in the proposed rule *(48 FR 5464),* except for deleting the words, "upon acceptance by DOE," as redundant in the first sentence; and changing the words, "upon assuming title," to "upon passage of title," in the second sentence to accord with common terminology.

Article VIII — Fees and Terms of Payment

Of those commenting on the one-time fee calculation methodologies covering spent fuel, over 80 percent favored the three (3) burnup range approach described in the proposed contract. This approach was endorsed by many utilities because it avoids extremely low and extremely high fees. It sustains the principle of equity and fairness by requiring all generators and owners of the spent nuclear fuel to bear a reasonable share of disposal costs. Further, it corresponds more closely to program costs. The four-tier approach finally adopted by DOE represents a refinement of the basic one endorsed by the majority of the commenters. This final four-tier approach, which introduces a new, lower burnup range (0-5,000 MWDT/MTU), is considered more appropriate and equitable as it is more representative of the actual industrywide distribution of spent nuclear fuel, encompassing low, average and high burnup fuel.

The first of the three alternatives for calculation of the one-time fee based on average burnup *(48 FR 5459)* was not adopted by DOE because it would unduly benefit, in effect, those possessing high-burnup spent fuel while penalizing those with low-burnup fuel. Further, it would impose definitional problems with respect to the terms "average spent nuclear fuel burnup."

The second alternative for calculation of the one-time fee, which was based on an "individual assembly basis," was not adopted by DOE, although it was supported by several commenters who said it is a straightforward approach that recognizes differences is assembly burnup due to initial cycle discharges, type of reactor, and structurally damaged or deformed fuel assemblies. In DOE's view, this approach weakens the fairness principle by unduly benefiting owners of low-burnup fuel while penalizing those with high-burnup fuel. This approach also conflicts with the Congressional intent to have those responsible for generating nuclear waste and spent fuel bear a reasonable share of disposal costs.

Article VIII A.4 of the contract in this final rule uses a methodology for calculating the one-time fee for incore fuel that retains the equivalency concept. Although the majority of commenters on the one-time fee for in-core fuel preferred an approach based upon a 1.0 mill/kwh charge because it is relatively simple and understandable, the Act precludes the Department from adopting this calculation methodology for nuclear fuel existing prior to April 7, 1983. The approach selected by DOE focuses on uranium loaded initially in a particular reactor core, and the total megawatt-days (thermal) generated by that core. This approach results in a fee that is defined in terms of dollars per kilogram, yet it is calculated to be equivalent to 1.0 mill/kwh. Several commenters suggested variations of this approach. In our judgment, this method represents a fair and verifiable way to calculate a one-time fee for in-core fuel, as of 12 A.M. April 7, 1983.

This methodology also avoids computational difficulties associated with an approach suggested by one commenter, which was to divide in-core fuel into equivalent fully burned assemblies and equivalent new assemblies.

Numerous comments were received on the fee provisions in Article VIII.A. Some commenters suggested that DOE's proposed provisions be more explicit and specifically state that the one-time fee for previously discharged SNF and in-core fuel will not be readjusted. To assure that the Nuclear Waste Fund would not lose money from a utility's decision to defer payment, they suggested that the one-time fee could escalate at the Government's cost of money until payment is made. DOE agrees that a better reading of the Act would permit the establishment of a one-time non-adjustable fee for previously discharged SNF and in-core fuel and it has adopted this approach. Also, recognizing that payment of this fee will occur at some date or dates after April 7, 1983, DOE has incorporated provisions which allow a Purchaser to finance its contractual fee obligation until paid, under terms which recognize the time value of money.

It was also suggested that the one-time fee be escalated on the basis of the 13-week Treasury Bill rate as reported on the first business day of each calendar quarter, from July 1, 1983 until first payment is made. DOE has adopted this suggested change but, in order to eliminate the complexities associated with calculation when an assigned three-month period does not coincide with a calendar quarter, the rates will instead be linked to assigned three-month periods. Additionally, the financed obligation of Purchaser arises on April 7, 1983 and not July 1, 1983, and the commencement date should therefore be the former.

Other commenters suggested that Article VIII.A.3, concerning the adjustment of the fee, be revised to say "full cost recovery" rather than "that all costs to be incurred by the Government shall be recovered." This change was adopted as it is consistent with the revised definition of "full cost recovery" in Article I paragraph 11.

Several commenters recommended clarifying guidance in Article VIII.A.3, and suggested that the adequacy of the fees be determined on a discounted cash flow basis fully recovering costs over a reasonable period of time, but not less than thirty years. This suggested change has not been made because DOE deems the present provision sufficient and consistent with Act. Nevertheless, DOE does contemplate that, at least for the immediate future, it will utilize the recommended approach for the most part in determining the adequacy of the fees.

Several commenters requested that the payment options in VIII.B.2 be made applicable to in-core fuel as well as SNF. DOE has adopted this recommendation. In view of the fact that the fee for in-core fuel will be paid with the fees for permanently retired SNF, use of the same payment options as have been established for SNF will simplify payment procedures.

Several commenters suggested that the interest on the outstanding fee balance be included as part of the fee under Payment Option #1 in Article III.B.2.(a), and that the interest be calculated on the outstanding balance at the date of "each payment," rather than at the date of the "first payment." The recommendation was adopted. Interest accruing on the SNF and in-core fuel fee obligation will be added to the Purchaser's financed obligation until the date of the first payment under the 40 quarters option, at which time it will be added to the SNF and in-core fuel fee obligation and financed at the 10-year Treasury note rate then in effect.

Numerous commenters recommended that the Purchaser be allowed to select a payment option within two years of the effective date of the contract rather than at the time of contract execution. This recommended change was adopted because payment of SNF fees will not begin for a number of years, and the two-year period to select a payment option will not work a disadvantage to the Government. In any event, interest will accrue on the financial obligation from April 7, 1983, until payment is received.

It was further recommended that Payment Option #1 be modified to allow a Purchaser electing this option under Articel VIII.B.2.a. to make full or partial lump sum payments. This recommendation was adopted because DOE, in keeping with policies established by the Office of Management and Budget and sound business practice, encourages the payment of debts owned to the Federal Government at the earliest opportunity.

Based upon its review of the comments received on Article VIII, and the payment options in particular, the Department has decided to include a third payment option which now appears as subparagraph B.2.(e). Under this new provision, a Purchaser may elect to pay the fee due for SNF and in-core fuel burned prior to April 7, 1983, with such payment to be made on or before June 30, 1985, in which event no interest is payable for the period April 7, 1983 to date of full payment.

A request was made to allow fee payments by check as well as the wire transfer required under Article VIII.B.3.(a). No change was made in the contract provision. If a particular Purchaser can demonstrate that wire transfer is impractical or unduly burdensome, a deviation may be sought to permit payment by check. However, no change has been made in this provision in view of the Government's paramount interest in having funds available for its use as soon as possible.

One commenter recommended that the payment options in Article VIII.B.2 be eliminated in their entirety. DOE has determined that the use of payment options is consistent with the Act and its legislative history, and serves to meet the interests of both the Government and the owners and generators who are required to bear the costs of the entire program.

One commenter questioned why interest payments applied to Payment Option #1, but not to Option #2. This has been interpreted by DOE as a suggestion that interest provisions be eliminated from Payment Option #1. Rather than eliminate interest provisions for Option #1, DOE has added interest provisions for Option #2. This modification recognizes the time value of the Purchaser's financial obligation after April 7, 1983.

A number of commenters said that the interest and penalty provisions of Article VIII. are excessive, and recommended that 130% of the Quarterly Treasury Rate be used. DOE's proposed interest penalty provisions have a foundation in law and policy, and serve to preclude the possibility that the Government will be an involuntary lender to a Purchaser. For this reason, no changes have been made to this contractual provision.

Some commenters requested that the words "Amount Due to DOE" in the formula for calculating interest on late payments in Article VIII.C. be changed to read *"Net* Unpaid Balance Due to DOE". This recommendation was deemed a desirable clarification and it was substantially adopted, so that it now reads, "Unpaid Balance Due to DOE."

Commenters also suggested that DOE notify Purchasers of unpaid or underpaid amounts within three years from the date on which payments were due to avoid unnecessary interest penalty accumulations. DOE will make a good faith effort to notify Purchasers of unpaid or underpaid amounts as soon as possible. However, the suggested change would toll DOE's right to apply interest on debts owed to the Government after three years, and it would clearly not be in its best interests, particularly when a determination of unpaid or underpaid amounts could not be made within three years.

Article IX — Delays

This clause has been revised by expanding the list of events considered to be beyond the reasonable control of the parties.

Under paragraph B, it is provided that "the *charges* and schedules will be equitably adjusted to reflect any estimated *additional* costs incurred by the party not responsible for the delay" (*underscoring* added). Seven commenters suggested deletion of the reference to "charges" as this seemed to them "not to make sense in the context of a full-cost recovery contract." It is precisely because DOE is required by the Act to assure full cost recovery that it deems the provision of Article IX.B. to be necessary and proper. To eliminate "charges" and limit the adjustment only to "schedules," as suggested, would leave DOE without any effective remedy and, in our view, be contrary to the letter and spirit of the Act. It would also subject all Purchasers, through increased fees that might be necessary without this provision, to be penalized for the inaction or careless action of one Purchaser, which would hardly be equitable. Accordingly, DOE has not modified this contract provision.

Similarly, DOE has also rejected an additional clause, suggested by three commenters, which would preclude "special, indirect or consequential damages . . . regardless of fault" because the net effect of such a clause would be to vitiate the remedy which both parties now have under Article IX.B.

One commenter suggested that this contract provision recognize that delays might arise out of "good faith" acts on the part of one party for which that party should not be held responsible. In our view, no revision relating to such "good faith" acts is necessary in this Article IX, since it clearly distinguishes between unavoidable delays (parag. A) and avoidable delays (parag. B), and, in our view, fairly protects the rights of both parties.

Article X — Suspension

Three substantive revisions to Article X were requested by about twelve commenters. One recommended change has been adopted; two have been rejected. At the end of paragraph A (formerly numbered paragraph "1"), a clarifying sentence has been added to state that any suspension imposed would be rescinded upon the completion of corrective action. On the other hand, DOE has not adopted a suggestion that any suspension should be restricted to the "affected portion" of the contract where several reactor units may be covered by one contract. DOE believes that such a compartmentalized type of remedy could result in a severe weakening of the Government's suspension remedy to the overall detriment of the program. However, DOE has modified Article X to provide that it has the discretion to suspend all or any portion of the contract.

Similarly, DOE has not adopted the suggestion that the second paragraph of Article X, relating to suspensions that may

be imposed in case of a national emergency, be deleted. Some commenters said that this paragraph may not be necessary in light of Article IX.A. (unavoidable delays). DOE believes that both provisions (Article IX.A. and X.B.) should be read together and that the express recognition of a national emergency which may require suspension and realignment of priorities is necessary and proper for inclusion in Article X.

One commenter suggested that Article X.B. (formerly numbered X.2.), which provides for an equitable refund in case of a national emergency suspension, should be modified or deleted as it might militate against an overall equitable settlement. DOE deems the present wording fair and equitable, and this recommendation has been rejected.

Article XI — Remedies

No significant comments were received on this clause and, accordingly, no change from the proposed rule has been made in Article XI.

Article XII — Notices

No significant comments were received on this provision and it remains the same as shown in the proposed rule.

Article XIII — Representation Concerning Nuclear Hazards Indemnity

A substantial number of commenters raised questions and suggested revisions in this article. One recommended change has been adopted by adding a new paragraph B to Article XIV, which expressly states that the indemnity protection provided to the Purchaser under any indemnity agreement given to a DOE facility contractor will survive the term of those contracts and inure thereafter to the benefit of the Purchaser.

It was also suggested that DOE should consider giving the Purchaser "equivalent protection" in the event the repository facility is operated directly by the Government in which case no indemnity could be given to a facility contractor with consequent coverage for the Purchaser. Since DOE intends to contract for its disposal operation services to the maximum practicable extent, DOE believes that a provision to furnish the Purchaser "equivalent protection" in any contrary event is unnecessary at this time and could, if the unlikely need arose, be covered by suitable contract amendment.

With respect to the current statutory authority under Section 170(d) of the Atomic Energy Act of 1954, as amended, which will expire on August 1, 1987, several commenters requested liability protection in the event the indemnity system under Section 170(d) expires or is changed. At this time, DOE has no reason to believe that Section 170(d) will not be extended as it has been in the past. However, if that system expires or is changed, then DOE might seek to extend, by suitable contract modification, such liability protection as might be permitted by existing or new law, recognizing that an NRC-licensed Purchaser is protected against liability for nuclear incidents arising out of covered activities at its site under financial protection arrangements required by NRC.

The present article states that the indemnity to be provided by DOE applies, *inter alia,* "to covered nuclear incidents . . . at a contract location." The term "contract location" means the DOE (repository) facility to be established under the Act (see Atomic Energy Act of 1954, as amended, sections 11(x) and 11(w), *42 U.S.C. 2014* (x) and (w)).

The proposed rule referred to the inclusion of an indemnity in contracts for transportation as well as the facility operation. This has been revised since financial protection for nuclear incidents arising out of transportation to or from an indemnified facility is afforded by NRC-required financial protection and by the indemnity which will be in the contract for operation of the repository. The indemnity in the repository contract will apply to the extent the person indemnified is not compensated by financial protection permitted or required by NRC.

With respect to non-nuclear hazards and possible third-party claims arising out of DOE's performance of the contract, several commenters suggested the inclusion of an indemnity provision that would protect the Purchaser against all claims for personal injuries or damage to property, "whether based wholly or in part upon [the] negligence . . . of the Purchaser or its . . . agents." DOE has not adopted this suggestion which it deems unnecessary and inappropriate. Any claims for personal injuries and/or property damage at the site would be covered under general principles of applicable law; that is to say, DOE could be held responsible for such injuries as are determined to be caused by the negligence of its agents or contractors in any suit brought by an injured third party against DOE directly, or against the Purchaser who might then implead DOE; and the same would apply to the liability of the Purchaser, as to which its usual third-party liability insurance would afford protection. By the same token, once DOE has accepted delivery and title, it would be primarily responsible for any non-nuclear accidents, and any impleading of the Purchaser in such claims would be covered under the Purchaser's regular insurance coverage.

The last sentence of (new) paragraph "A" in Article XIV refers to the "conditions stated in the indemnity agreement," as to which some commenters asked for a copy. Obviously, DOE cannot now provide copies of such an indemnity since there is, as yet, no DOE repository contract in existence. However, it is contemplated that such contractor(s), when selected, will be covered by including in the contract(s) for repository operation, the nuclear hazards indemnity clause set forth in the DOE Procurement Regulations at § 9-50.704-6.

Article XIV — Assignment

The only revision made in this clause, to be consistent with the Act, was to change the word "Party" to "Purchaser."

Article XV — Amendments

This clause was added to expressly recognize that DOE or the Purchaser may wish to amend the contract in the future to more accurately or equitably reflect their respective interests. The article requires that any such amendment be mutually agreeable and consistent with this final rule as it may from time to time be amended.

Article XVI — Disputes

This provision (set out in the proposed rule in Appendix H, clause 1) remains essentially unchanged in this final rule. Several commenters suggested that the contract should apply the provisions in the Contract Disputes Act of 1978 (Pub. L. 95-563). We have not accepted this suggestion for a number of reasons. Section 3 of Pub. L. 95-563 specifically lists the types of contracts to which that Act is to apply, namely, the procurement of property, services, construction, alteration, repair or maintenance and the disposal of personal property. The nuclear waste disposal contract, which involves not the Government procurement of services but rather its furnishing of such services, is clearly beyond the purview of Pub. L. 95-563, as shown by the language of that statute, as well as its legislative history. The Department has therefore not adopted this suggestion, but has utilized the DOE pre-Contracts Disputes Act process of dispute resolution with the addition of the requirement of certification of claims in excess of $50,000.

Other commenters suggested that the certification of accuracy and completeness of any claim over $50,000 be deleted; that arbitration of disputes be allowed, and that continuation of performance be restricted to those areas not in dispute.

We believe that the certification of accuracy and completeness of claims in excess of $50,000 is reasonable and appropriate to protect both the Government and the Purchaser from frivolous or fraudulent claims. The suggestion to allow arbitration of all disputes was not adopted, since the Government is not to be bound by decisions of third parties; the contracting officer, as the first level deciding official on a claim under this clause, is required to exert all efforts to satisfactorily resolve issues at dispute; as such, arbitration would be likely to protract rather than accelerate the ultimate resolution.

The suggestion that continuation of performance of the contract be required only in those areas not in dispute was not accepted, as such a provision would be inconsistent with the fundamental purpose of the disputes resolution process — namely continuing performance of the contract during pendency of a dispute between the parties. To allow either party to suspend performance unilaterally based upon a dispute would effectively serve to negate the contract. If a party disputed the financial provisions, transportation scheduling, or environmental, safety and health requirements of packaging of nuclear fuel or waste, it could cease to perform in these areas. This we believe to be unworkable and inconsistent with the intent of Public Law 97-425. Accordingly, we have not accepted this suggestion.

At the suggestion of several commenters, a change was made to provide for ninety (90) days, instead of thirty (30) days, for Purchaser to appeal the decision of the Contracting Officer

Article XVII — Officials Not To Benefit

No significant comments have been received on this clause (formerly Appendix H, clause 2), and, accordingly, no change has been made.

Article XVIII — Covenant Against Contingent Fees

Some commenters suggested this clause be deleted as it seemed to them to be unnecessary. The clause is required in Government contracts by Executive Order 9001 and *10 U.S.C. 2306*(b); accordingly, we have not adopted this suggestion.

Article XIX — Examination of Records

Several commenters questioned the need to retain records for three (3) years after final payment under this contract.

This requirement stems from the statutory authority of the Comptroller General to conduct audits relating to the receipt and expenditure of public funds under the Budget and Accounting Act of 1921 *(31 U.S.C. 53*(a) and (b)). To effectively carry out these audit responsibilities, the Comptroller General is authorized for a period of three (3) years after final payment of a contract to examine any directly pertinent books or records relating to transactions under the contract *(10 U.S.C. 2313*(b)). In view of these statutory requirements, and recognizing that reactor facility operators are now required by law to maintain a variety of records during the entire life span of the facility, we have not adopted recommended changes to this contract provision.

Article XX — Permits

No change from clause set out in proposed rule (see Appendix H, clause 5) was made in this Article XV.

Article XXI — Rights in Technical Data

Several commenters requested that DOE not require Purchasers to submit any technical data called for by DOE under the contract where the Purchaser has an agreement with a third party restricting release of such data. DOE has not accepted this suggestion as the technical data required to be submitted under this contract has been determined to be necessary. However, DOE has added a new paragraph at the end of this clause (formerly in Appendix H, clause 6) to cover those cases where the Purchaser has received proprietary data from a third party who has previously imposed restrictions on its use or disclosure, The new provision requires the Purchaser to obtain the consent of such third party.

Article XXII — Entire Contract

This provision was revised, at the suggestion of several commenters, by the deletion of the second sentence which referred to "collateral contracts . . . [being] superseded." It was not and is not DOE's intent, by having executed this contract, to abrogate other contracts which a Purchaser may have. To make this intent clear, a new paragraph B has been added to this Article XXII.

*Appendices*

There were numerous comments on the contract appendices contained in the proposed rule published on February 4, 1983. We have carefully evaluated all the changes recommended by the commenters. Based upon our review, seven of the eight appendices in the proposed rule (Appendices A, B, C, D, E, F and G) have been revised; these now appear in this final rule as Appendices A, C, D, B, E, F and G. Appendix H in the proposed rule contained six contract clauses which are now part of the contract itself (Articles XVI through XXI).

The referenced modifications were made because we believe they eliminate unnecessary paperwork and data gathering while still providing the Department with the information it requires to effectively administer the contract. This reduction of the data required is in the best interests of the Government because it reduces the paperwork and administrative demands on the Department. The referenced modifications also bring the appendices more in line with current utility industry practices on data collection and management. By requesting information in a manner which is easier for the utilities to provide, it reduces the likelihood of error, makes the auditing functions of the Department easier, and in general simplifies the operations of both the utilities and the Department. Specific comments on each appendix follow.

*Appendix A* (Nuclear Power Reactor(s) and Other Facilities Covered)

A number of commenters suggested a slightly modified approach to this appendix, including a description of the facility which was more informative than that contained in the proposed rule. This approach was adopted.

*Appendix B* (Discharge Information (Ten Year; Annual))

This appendix appeared as Appendix D in the proposed rule. A number of commenters requested that the "commitment year for delivery" be deleted and this was done because the information is provided in Appendix C. Likewise, several commenters felt that shipping information could be covered more appropriately in the appendix containing the delivery commitment schedule (Appendix C) and this suggestion was accepted. A tabular format for the ten-year discharge forecast was proposed and adopted. This format makes the data more accessible to and understandable by the Department.

*Appendix C* (Delivery Commitment Schedule)

This Appendix appeared as Appendix B in the proposed rule. Its format was modified and simplified in response to a number of recommendations, and it was made more consistent with Article V. A substantial number of commenters questioned the requirement for proof of ownership of the SNF and/or HLW to be delivered to DOE. Since DOE will, upon delivery and acceptance of the SNF and/or HLW, be taking title to such material, it must assure itself that the Purchaser can legally convey clear title.

*Appendix D* (Final Delivery Schedule)

This appendix was formerly Appendix C in the proposed rule. A clearer format was proposed and accepted, but the data requested by this appendix remain essentially unchanged. The revised format recognizes that there could be a range of discharge dates, not just one, and provides space to accommodate this.

*Appendix E* (General Specifications)

A number of commenters stated that the radioactive release test was an unnecessary burden for both the utilties and DOE. This requirement has been deleted because the data are not essential and the test is time-consuming and expensive. Several commenters felt that the scope of nonfuel components was too limited, and should be expanded to include additional equipment and hardware. This recommendation was considered appropriate and was adopted. In addition, the need for maximum physical dimensions was questioned, and it was recommended that they be deleted. DOE did not adopt this recommendation because it must have some basic dimensions around which to design its handling and disposal facilities. Such information will serve to minimize construction and operating costs which is in the best interest of all parties. A number of commenters believed that the specification on cladding materials was not needed. This provision has been eliminated because DOE will accept all standard cladding materials.

The need for non-standard fuel definitions was questioned by some commenters. These definitions have not been changed because they relate to information considered necessary by DOE in order to establish its operating procedures and schedules.

One commenter requested that the Department provide the containers for failed fuel at no cost to the utilities. This was rejected because the furnishing of such containers is part of the normal utility cost for the operation of its spent fuel storage basin. Several commenters said that a separate classification for consolidated fuel rods was needed. This suggestion was accepted because none of the existing classifications was appropriate for assemblies which have been disassembled.

*Appendix F* (Detailed Description of Purchasers Fuel)

Appendix F was greatly simplified and made consistent with industry terminology and practice. A number of commenters stated that far too much detail was requested. A revised format proposed by one commenter was more understandable than that contained in its proposed rule, and was adopted. The requirement for drawings was made simpler and more manageable. Many non-standard terms for the industry were removed as requested by a number of commenters.

*Appendix G* (Standard Remittance Advice)

Appendix G remains substantially unchanged. Several commenters suggested deleting references to "meter" and "meter reading" as the information to be so provided may require calculations not merely referring to a "meter". DOE agrees and such references have been deleted, though the requirement for the information remains unchanged. Several commenters noted inconsistencies in references to "net" as well as "gross" electricity generated. As DOE now interprets the Act to require disposal charges based upon "gross" electricity generated by the Purchaser's civilian nuclear power reactors, references to "net" have been deleted. One commenter suggested that a reference be added to identify the "responsible DOE office"; however, since there are several offices involved in the processing of the payments to be made hereunder, DOE has not adopted this suggestion.

*C. Additional Public Comments*

In addition to the public comments keyed to the contract articles and discussed in Section III.B. above, DOE received other comments relating to the proposed rule of February 4, 1983. A summary of these comments and DOE's action taken

with respect to each is set forth below.

Several commenters suggested that the proposed standard contract not be part of the rule itself. DOE has not adopted this suggestion because, as stated in the February 4 Federal Register notice *(48 FR 5459),* it continues to believe that the rulemaking process offers the best opportunity for interested persons to participate in DOE's nuclear waste disposal activities. This applies equally to the promulgation of this final rule regarding the standard contract and any later amendments to the rule that may be needed.

Some commenters requested that DOE issue separate contracts for each reactor or facility receiving DOE's disposal services. We believe this would be an unnecessary increase in paperwork and workload as the contract (see Appendix A) clearly provides for Purchasers to list any multiple reactors or facilities to be covered and requires separate scheduling information for each site to be serviced by DOE. Therefore, we have not adopted this suggestion.

Three commenters suggested that the deviation procedure set out in Section 961.4 of the rule could prove onerous or administratively burdensome and they suggested its deletion. DOE disagrees. As stated in the February 4 Federal Register notice *(48 FR 5459),* "DOE intends to use the rule and standard contract *unless* special circumstances are found *and* the . . . deviations procedures are followed." To achieve maximum uniformity in the type of standard contract to be used and, at the same time, to allow for necessary adjustments that may be needed to accommodate the special or unique circumstances of particular Purchasers, we view the deviation procedure of section 961.4 quite reasonable and proper. The recommended deletion has therefore not been adopted.

Two State agencies raised the question of advance notification to be given with respect to any planned transportation of the SNF and/or HLW through the State (by truck, rail or barge). As the standard contract provides, DOE will be responsible for the transportation of SNF and/or HLW from the Purchaser's site to the DOE facility. It is comtemplated that DOE and its transportation contractors will, to the extent required by applicable law and regulations, provide such advance notification to the affected States.

Article VIII.E. of the contract in this final rule provides for audit rights on the part of DOE as well as the Comptroller General (see also Article XIX). Most of the utilities and industry organizations commenting on the proposed rule requested that similar audit rights be given to the Purchaser and/or State utility commissions. DOE has not accepted this recommended approach for several reasons. First and foremost, no such procedure is authorized, expressly or implicitly, by the Act itself. Secondly, we believe that the existing statutory scheme and the information to be provided by DOE under the contract will be sufficient for Purchasers, and indeed the general public, to assess the performance and progress of DOE in its nuclear waste disposal program. This dissemination of information will be accomplished in a variety of ways, including: (1) A comprehensive mission plan; (2) an annual audit conducted by the Comptroller General; (3) an annual DOE report to Congress on activities and expenditures; (4) an annual Treasury Department report to Congress on the financial condition and operations of the Program; (5) a triennial budget to Congress; and (6) a possible audit of the program by a private firm of certified public accountants.

Similarly, seven commenters addressed the question of DOE performance standards and Purchaser remedies with respect to performance. In essence, these commenters pointed out that no date exists other than the January 31, 1998 date to evaluate DOE's program performance. If that date is not met, these commenters say, the contract provides no specific remedies against DOE for failing to meet the date. DOE has considered this comment and the suggestion that suitable language be included in the contract, but it has decided not to adopt the recommended modification. We recognize that these issues are of concern to the utilities. However, we believe that we should be consistent with the language of the Act. The 1998 date is called for in the Act, and we believe it to be a realistic date. Our performance will be judged by meeting this date. If the intent of the Act was to have intermediate performance standards or dates, they could have been specified in the Act.

A few commenters requested that the contract contain a severability provision which would, in effect, state that if a court of competent jurisdiction should rule that one or more of the contractual provisions were invalid, this would not affect the validity of other parts of the contract. Such a provision is not infrequently found in statutes (Federal and State), but its inclusion in contracts is not common. For this reason, and because we do not feel it proper to attempt to limit judicial review or remedies in an administrative rule, we have not adopted this suggested provision.

With respect to the schedule of fees to be levied by DOE, some commenters suggested that the disposal fees not be set out in the contract, but rather that they be set forth as a separate section in the final rule itself, which would allow the fees to be changed without modification of individual contracts. We believe the fee provisions are an integral part of the

contract and that inclusion of these important provisions is necessary for the contract to be self-sufficient and complete upon execution. Should the Department determine in the future that modification of the individual disposal contracts was an unnecessary workload burden, the Department would consider adopting the suggested procedure.

Most of the commenters believe that, in the event DOE subsequently chooses to use or process the SNF and/or HLW for purposes other than disposal, an appropriate credit should be provided.

At this time, the Department has chosen to defer a decision on providing credits, for whatever reason, to the utilities or to the Nuclear Waste Fund because we are uncertain as to the type and kinds of credits that could be applied to the utilities or to the Fund. We recognize the comments calling for credits for reprocessing SNF. We also recognize that other types of credits may become appropriate. We intend to reconsider this issue when and if reprocessing actually becomes a viable enterprise for the utilities, and when we also ascertain the other types of credits that may or may not be appropriate for the industry.

IV. Final Rule

The purpose of this new Part 961, as indicated in § 961.1, is to establish a standard contract that will be used to provide DOE's nuclear waste disposal services to a Purchaser. The term "Purchaser" is defined in section 961.3.

Section 961.2 relates to applicability and describes who is covered by the part. A critical feature of this section is that to have SNF and HLW disposed of in DOE's repository, an owner or generator of such nuclear fuel or waste must execute a contract with DOE by June 30, 1983, or by the date on which an owner or generator begins generating or takes title to such fuel or waste.

Section 961.3 sets forth pertinent definitions and incorporates the more extensive list of definitions contained in Article II of the contract which is found in § 961.11.

Section 961.4 provides for deviations from the rule as well as from the contract which is found at § 961.11. DOE has included this provision because special circumstances may exist or arise that would warrant a departure from the rule or standard contract. As mentioned above, however, DOE intends to use the rule and standard contract unless special circumstances are found and the proposed deviation procedures are followed.

Section 961.5 specifies that Federal agencies which require DOE's nuclear waste disposal services shall enter into an interagency agreement which commits those agencies to the terms and conditions, including the fee schedules, contained in the proposed standard contract.

Section 961.11 sets forth the standard contract that DOE and owners and generators of SNF and/or HLW will execute for the disposal of such fuel or waste, as described in Section III.C. above.

V. Procedural Requirements

A. *Executive Order No. 12291.* Under Executive Order 12291 agencies are required to determine whether proposed rules are major rules as defined in the Order. DOE has reviewed this final rule and, after consultation with the Office of Management and Budget, has determined that it is not a major rule because: it will not have an annual effect on the economy of $100 million or more; it will not result in a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions; and it will not have significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises. While the money to be paid by members of the electric utility industry under the contracts that are subject of this rule will exceed $100 million annually, and may even be considered a major cost to the industry, these costs would not be the result of this rule. The costs are the result of the need to dispose of spent nuclear fuel and/or high-level radioactive waste, a need recognized in the Nuclear Waste Policy Act of 1982. The particular provisions of this rule have little impact on the actual costs of disposal and certainly less than $100 million annually.

B. *Regulatory Flexibility Act.* In accordance with secton 605(b) of the Regulatory Flexibility Act, *5 U.S.C. 601, et seq.,* DOE finds that sections 603 and 604 of the said Act do no apply to this rule because it will not have a significant economic impact on a substantial number of small entities. This finding is based on the fact that the parties to the contract, who will be owners or generators of spent nuclear fuel or high-level radioactive waste, are not small entities.

C. *National Environmental Policy Act.* Execution of the standard contract contained in this rulemaking will not commit DOE to any specific activities not already prescribed by the Nuclear Waste Policy Act. Activities allowed under the Act will receive appropriate environmental review at the proper time, i.e., when such activities are proposed in accordance with the process established in the Act. Therefore, DOE has concluded that neither this rulemaking nor the execution of the contracts gives rise to any action not already prescribed by the Act and, thus, is not a major Federal action significantly affecting the quality of the human environment. Accordingly, preparation of either an environmental assessment or an environmental impact statement is not required.

D. *Paperwork Reduction Act.* In accordance with Section 3504(h) of the Paperwork Reduction Act of 1980 (Pub. L. 96-511), this rule has been submitted to the Office of Management and Budget (OMB), which has approved the data collection requirements contained herein.

List of Subjects in 10 CFR Part 961

Government contracts, Nuclear materials, Nuclear power plants and reactors, Radiation protection, Waste treatment and disposal.

Section 553(d) of the Administrative Procedure Act generally requires that a substantive rule be published 30 days before its effective date. An exception to this requirement exists when an agency finds good cause for an earlier effective date. DOE has determined that good cause exists to make this rule effective immediately, because this will allow owners of civilian nuclear power reactors the maximum amount of time to consider the rule before the June 30, 1983, statutory deadline for their entering into a contract for the disposal of spent fuel.

For the reasons set out above, a new Part 961 of Chapter III of Title 10, Code of Federal Regulations, is to be established as set forth below.

Issued in Washington, D.C., April 11, 1983.

Hilary J. Rauch,

Director, Procurement & Assistance Management Directorate.

Title 10, Chapter III of the Code of Federal Regulations is hereby amended by adding a new Part 961, to read as follows:

PART 961 — STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE

Subpart A — General

Sec.

961.1 Purpose.

961.2 Applicability.

961.3 Definitions.

961.4 Deviations.

961.5 Federal Agencies.

961.6-961.10 [Reserved]

Subpart B — Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste

961.11 Text of the contract.

Authority: Sec. 644, Pub. L. 95-91, 91 Stat. 599 *(42 U.S.C. 7254)* and Sec. 302, Pub. L. 97-425, 96 Stat. 2257 *(42 U.S.C. 10222)*.

Subpart A — General

§ 961.1 Purpose.

This part establishes the contractual terms and conditions under which the Department of Energy (DOE) will make available nuclear waste disposal services to the owners and generators of spent nuclear fuel (SNF) and high-level radioactive waste (HLW) as provided in Section 302 of the Nuclear Waste Policy Act of 1982 (Pub. L. 97-425). Under the contract set forth in § 961.11 of this Part, DOE will take title to, transport, and dispose of spent nuclear fuel and/or high-level radioactive waste delivered to DOE by those owners or generators of such fuel or waste who execute the contract. In addition, the contract will specify the fees owners and generators of SNF and/or HLW will pay for these services. All receipts, proceeds, and revenues realized by DOE under the contract will be deposited in the Nuclear Waste Fund, an account established by the Act in the U.S. Treasury. This fund will pay for DOE's radioactive waste disposal activities, the full costs of which will be borne by the owners and generators under contract with DOE for disposal services.

§ 961.2 Applicability.

This part applies to the Secretary of Energy or his designee and any person who owns or generates spent nuclear fuel or high-level radioactive waste, of domestic origin, generated in a civilian nuclear power reactor. If executed in a timely manner, the contract contained in this part will commit DOE to accept title to, transport, and dispose of such spent fuel and waste. In exchange for these services, the owners or generators of such fuel or waste shall pay fees specified in the contract which are intended to recover fully the costs of the disposal services to be furnished by DOE. The contract must be signed by June 30, 1983, or by the date on which such owner or generator commences generation of, or takes title to, such spent fuel or waste, whichever occurs later.

§ 961.3 Definitions.

For purposes of this part —

"Act" means the Nuclear Waste Policy Act of 1982, Pub. L. 97-425, 96 Stat. 2201 *et seq., 42 U.S.C. 10101 et seq.*

"Contract" means the agreement set forth in § 961.11 of this part and any duly executed amendment or modification thereto.

"Generator" means any person who is licensed by the Nuclear Regulatory Commission to use a utilization or production facility under the authority of section 103 or 104 of the Atomic Energy Act of 1954 *(42 U.S.C. 2133,* 2134).

"Owner" means any person who has title to spent nuclear fuel or high-level radioactive waste.

"Purchaser" means any person, other than a Federal agency, who is licensed by the Nuclear Regulatory Commission to use a utilization or production facility under the authority of sections 103 or 104 of the Atomic Energy Act of 1954 *(42 U.S.C. 2133,* 2134) or who has title to spent nuclear fuel or high level radioactive waste and who has executed a contract with DOE.

"Secretary" means the Secretary of Energy of his designee.

Other definitions relating to the subject matter of this rule are set forth in Article II of the contract which is contained in § 961.11, Text of the contract, below.

§ 961.4 Deviations.

Requests for authority to deviate from this part shall be submitted in writing to the Contracting Officer, who shall forward the request for approval to the Senior Procurement Official, Headquarters. Each request for deviation shall contain the following information:

(a) A statement of the deviation desired, including identification of the specific paragraph number(s) of the contract;

(b) A description of the intended effect of the deviation;

(c) The reason why the deviation is considered necessary or would be in the best interests of the Government;

(d) The name of the owner or generator seeking the deviation and nuclear power reactor(s) affected;

(e) A statement as to whether the deviation has been requested previously and, if so, circumstances of the previous request;

(f) A statement of the period of time for which the deviation is needed; and

(g) Any pertinent background information will contribute to a full understanding of the desired deviation.

§ 961.5 Federal agencies.

Federal agencies or departments requiring DOE's disposal services for SNF and/or HLW will be accommodated by a suitable interagency agreement reflecting, as appropriate, the terms and conditions set forth in the contract in § 961.11; *provided, however,* that the fees to be paid by Federal agencies will be equivalent to the fees that would be paid under the contract.

§ § 961.6-961.10 [Reserved]

Subpart B — Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste

§ 961.11 Text of the contract.

The text of the standard contract for disposal of spent nuclear fuel and/or high/level radioactive waste follows:

U.S. Department of Energy Contract No. — —

Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste

THIS CONTRACT, entered into this — day of — — — 19 — , by and between the UNITED STATES OF AMERICA (hereinafter referred to as the "Government"), represented by the UNITED STATES DEPARTMENT OF ENERGY (hereafter referred to as "DOE") and — — — — — — , (hereinafter referred to as the "Purchaser"), a corporation organized and existing under the laws of the State of — — — — — — [add as applicable: "acting on behalf of itself and — — — ."].

Witnesseth that:

Whereas, the DOE has the responsibility for the disposal of spent nuclear fuel and high-level radioactive waste of domestic origin from civilian nuclear power reactors in order to protect the public health and safety, and the environment; and

Whereas, the DOE has the responsibility, following commencement of operation of a repository, to take title to the spent nuclear fuel or high-level radioactive waste involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent nuclear fuel; and

Whereas, all costs associated with the preparation, transportation, and the disposal of spent nuclear fuel and high-level radioactive waste from civilian nuclear power reactors shall be borne by the owners and generators of such fuel and waste; and

Whereas, the DOE is required to collect a full cost recovery fee from owners and generators delivering to the DOE such spent nuclear fuel and/or high level radioactive waste; and

Whereas, the DOE is authorized to enter into contracts for the permanent disposal of spent nuclear fuel and/or high-level radioactive waste of domestic origin in DOE facilities; and

Whereas, the Purchaser desires to obtain disposal services from DOE; and

Whereas, DOE is obligated and willing to provide such disposal services, under the terms and conditions hereinafter set forth; and

Whereas, this contract is made and entered into under the authority of the DOE Organization Act (Pub. L. 95-91, *42 U.S.C. 7101 et seq.* ) and the Nuclear Waste Policy Act of 1982 (Pub. L. 97-425, *42 U.S.C. 10101 et seq.* )

Now, therefore, the parties hereto do hereby agree as follows:

48 FR 16590

Article I — Definitions

As used throughout this contract, the following terms shall have the meanings set forth below:

1. The term "assigned three-month period" means the period that each Purchaser will be assigned by DOE, giving due consideration to the Purchaser's assignment preference, for purposes of reporting kilowatt hours generated by the Purchaser's nuclear power reactor and for establishing fees due and payable to DOE.

2. The term "cask" means a container for shipping spent nuclear fuel and/or high-level radioactive waste which meets all applicable regulatory requirements.

3. The term "civilian nuclear power reactor" means a civilian nuclear powerplant required to be licensed under Sections 103 or 104(b) of the Atomic Energy Act of 1954, as amended *(42 U.S.C. 2133,* 2134(b)).

4. The term "Commission" means the United states Nuclear Regulatory Commission.

5. The term "contract" means this agreement and any duly executed amendment or modification thereto.

6. The term "Contracting Officer" means the person executing this contract on behalf of the Government, and any other officer or civilian employee who is a properly disignated Contracting Officer of the DOE; and the term includes, except as otherwise provided in this contract, the authorized representative of a Contracting Officer acting within the limits of his authority.

7. The term "delivery" means the transfer of custody, f.o.b. carrier, of spent nuclear fuel or high-level radioactive waste from Purchaser to DOE at the Purchaser's civilian nuclear power reactor or such other domestic site as may be designated by the Purchaser and approved by DOE.

8. The term "disposal" means the emplacement in a repository of high-level radioactive waste, spent nuclear fuel, or other highly radioactive waste with no foreseeable intent of recovery, whether or not such emplacement permits recovery of such waste.

9. The term "DOE" means the United States Department of Energy or any duly authorized representative thereof, including the Contracting Officer.

10. The term "DOE facility" means a facility operated by or on behalf of DOE for the purpose of disposing of spent nuclear fuel and/or high-level radioactive waste, or such other facility(ies) to which spent nuclear fuel and/or high-level radioactive waste may be shipped by DOE prior to its transportation to a disposal facility.

11. The term "full cost recovery," means the recoupment by DOE, through Purchaser fees and any interest earned, of all direct costs, indirect costs, and all allocable overhead, consistent with generally accepted accounting principles consistently applied, of providing disposal services and conducting activities authorized by the Nuclear Waste Policy Act of 1982 (Pub. L. 97-425). As used herein, the term "cost" includes the application of Nuclear Waste Fund moneys for those uses expressly set forth in section 302 (d) and (e) of the said Act and all other uses specified in the Act.

12. The term "high-level radioactive waste" (HLW) means —

(a) the highly radioactive material resulting from the reprocessing of spent nuclear fuel, including liquid waste produced directly in reprocessing and any solid material derived from such liquid waste that contains fission products in sufficient concentrations; and

(b) other highly radioactive material that the Commission, consistent with existing law, determines by rule requires permanent isolation.

13. The term "kilowatt hours generated" means electricity generated by nuclear fuel at a civilian nuclear power reactor specified in Appendix A hereto as measured at the output terminals of the turbine generator.

14. The term "metric tons uranium" means that measure of weight, equivalent to 2,204.6 pounds of uranium and other fissile and fertile material that are loaded into a reactor core as fresh fuel.

15. The term "Purchaser's site" means the location of Purchaser's civilian nuclear power reactor or such other location as the Purchaser may designate.

16. The term "quarterly Treasury rate" means the current value of funds rate as specified by the Treasury Fiscal Requirements Manual, Volume 1, Part 6, section 8020.20. This rate is published quarterly in the Federal Register prior to the beginning of the affected quarter.

17. The term "shipping lot" means a specified quantity of spent nuclear fuel or high-level radioactive waste designated by Purchaser for delivery to DOE beginning on a specified date.

18. The term "spent nuclear fuel" (SNF) means fuel that has been withdrawn from a nuclear reactor following irradiation, the consistituent elements of which have not been separated by reprocessing.

19. The term "spent nuclear fuel and high-level radioactive waste of domestic origin" means irradiated fuel material used, and radioactive wastes resulting from such use, in nuclear power reactors located only in the United States.

20. The term "year" means the period which begins on October 1 and ends on September 30.

Article II — Scope

This contract applies to the delivery by Purchaser to DOE of SNF and/or HLW of domestic origin from civilian nuclear power reactors, acceptance of title by DOE to such SNF and/or HLW, subsequent transportation, and disposal of such SNF and/or HLW and, with respect to such material, establishes the fees to be paid by the Purchaser for the services to be rendered hereunder by DOE. The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article V below. The services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A, annexed hereto and made a part hereof, has been disposed of.

Article III — Term

The term of this contract shall be from the date of execution until such time as DOE has accepted, transported from the Purchaser's site(s) and disposed of all SNF and/or HLW of domestic origin from the civilian nuclear power reactor(s) specified in Appendix A.

Article IV — Responsibilities of the Parties

A. Purchaser's Responsibilities

1. *Discharge Information.*

(a) On an annual basis, commencing October 1, 1983, the Purchaser shall provide DOE with information on actual discharges to date and projected discharges for the next discharges to date and projected discharges for the next ten (10) years in the form and content set forth in Appendix B, annexed hereto and made a part hereof. The information to be provided will include estimates and projections and will not be Purchaser's firm commitment with respect to discharges or deliveries.

(b) No later than October 1, 1983, the Purchaser shall provide DOE with specific information on:

(1) Total spent nuclear fuel inventory as of April 7, 1983;

(2) Total number of fuel assemblies removed from the particular reactor core prior to 12:00 a.m. April 7, 1983 for which there are plans for reinsertion in the core, indicating the current planned dates for reinsertion in the core. Estimates of the burned and unburned portion of each individual assembly are to be provided.

(c) In the event that the Purchaser fails to provide the annual forecast in the form and content required by DOE, DOE may, in its sole discretion, require a rescheduling of any delivery commitment schedule then in effect.

2. *Preparation for Transportation.*

(a) The Purchaser shall arrange for, and provide, all preparation, packaging, required inspections, and loading activities necessary for the transportation of SNF and/or HLW to the DOE facility. The Purchaser shall notify DOE of such activities sixty (60) days prior to the commencement of such activities. The preparatory activities by the Purchaser shall be made in accordance with all applicable laws and regulations relating to the Purchaser's responsibilities hereunder.

DOE may designate a representative to observe the preparatory activities conducted by the Purchaser at the Purchaser's site, and the Purchaser shall afford access to such representative.

(b) Except as otherwise agreed to by DOE, the Purchaser shall advise DOE, in writing as specified in Appendix F, annexed hereto and made a part hereof, as to the description of the material in each shipping lot sixty (60) days prior to scheduled DOE transportation of that shipping lot.

(c) The Purchaser shall be responsible for incidental maintenance, protection and preservation of any and all shipping casks furnished to the Purchaser by DOE for the performance of this contract. The Purchaser shall be liable for any loss of or damage to such DOE-furnished property, and for expenses incidental to such loss or damage while such casks are in the possession and control of the Purchaser except as otherwise provided for hereunder. Routine cask maintenance, such as scheduled overhauls, shall not be the responsibility of the Purchaser.

*B. DOE Responsibilities*

1. DOE shall accept title to all SNF and/or HLW, of domestic origin, generated by the civilian nuclear power reactor(s) specified in Appendix A, provide subsequent transportation for such material to the DOE facility, and dispose of such material in accordance with the terms of this contract.

2. DOE shall arrange for, and provide, a cask(s) and all necessary transportation of the SNF and/or HLW from the Purchaser's site to the DOE facility. Such cask(s) shall be furnished sufficiently in advance to accommodate scheduled deliveries. Such cask(s) shall be suitable for use at the Purchaser's site, meet applicable regulatory requirements, and be accompanied by pertinent information including, but not limited to, the following:

(a) Written procedures for cask handling and loading, including specifications on Purchaser-furnished cannisters for containment of failed fuel;

(b) Training for Purchaser's personnel in cask handling and loading, as may be necessary;

(c) Technical information, special tools, equipment, lifting trunnions, spare parts and consumables needed to use and perform incidental maintenance on the cask(s); and

(d) Sufficient documentation on the equipment supplied by DOE.

3. DOE may fulfill any of its obligations, or take any action, under this contract either directly or through contractors.

4. DOE shall annually provide to the Purchaser pertinent information on the waste disposal program including information on cost projections, project plans and progress reports.

5. (a) Beginning on April 1, 1991, DOE shall issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance, except as provided in paragraphs B and D of Article V and paragraph B.3 of Article VI hereof.

(b) Beginning not later than July 1, 1987, DOE shall issue an annual capacity report for planning purposes. This report shall set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility.

Article V — Delivery of SNF and/or HLW

A. Description of SNF and HLW

The Purchaser shall deliver to DOE and DOE shall, as provided in this contract, accept the SNF and/or HLW which is described in accordance with Article VI.A. of this contract, for disposal thereof.

B. Delivery Commitment Schedule

1. Delivery commitment schedule(s), in the form set forth in Appendix C annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. After DOE has issued its proposed acceptance priority ranking, as described in paragraph B.5 of Article IV hereof, beginning January 1, 1992 the Purchaser shall submit to DOE the delivery commitment schedule(s) which shall identify all SNF and/or HLW the Purchaser wishes to

deliver to DOE beginning sixty-three (63) months thereafter. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval.

2. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s). Purchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus (+/-) twenty percent (20%), and the delivery schedule up to two (2) months, until the submission of the final delivery schedule.

C. Final Delivery Schedule

Final delivery schedule(s), in the form set forth in Appendix D, annexed hereto and made a part hereof, for delivery of SNF and/or HLW covered by an approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than twelve (12) months prior to the delivery date specified therein. DOE shall approve or disapprove a final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s).

D. Emergency Deliveries

Emergency deliveries of SNF and/or HLW may be accepted by DOE before the date provided in the delivery commitment schedule upon prior written approval by DOE.

E. Exchanges

Purchaser shall have the right to determine which SNF and/or HLW is delivered to DOE; *provided, however,* that Purchaser shall comply with the requirements of this contract. Purchaser shall have the right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF and/or HLW; *provided, however,* that DOE shall, in advance, have the right to approve or disapprove, in its sole discretion, any such exchanges. Not less than six (6) months prior to the delivery date specified in the Purchaser's approved delivery commitment schedule, the Purchaser shall submit to DOE an exchange request, which states the priority rankings of both the Purchaser hereunder and any other Purchaser with whom the exchange of approved delivery commitment schedules is proposed. DOE shall approve or disapprove the proposed exchange within thirty (30) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval.

Article VI — Criteria for Disposal

A. General Requirements

1. *Criteria.*

(a) Except as otherwise provided in this contract, DOE shall accept hereunder only such SNF and/or HLW which meets the General Specifications for such fuel and waste as set forth in Appendix E, annexed hereto and made a part hereof.

(b) Purchaser shall accurately classify SNF and/or HLW prior to delivery in accordance with paragraphs B and D of Appendix E.

2. *Procedures.*

(a) Purchaser shall provide to DOE a detailed description of the SNF and/or HLW to be delivered hereunder in the form and content as set forth in Appendix F, annexed hereto and made a part hereof. Purchaser shall promptly advise DOE of nay changes in said SNF and/or HLW as soon as they become known to the purchaser.

(b) DOE's obligation for disposing of SNF under this contract also extends to other than standard fuel; however, for any SNF which has been designated by the Purchaser as other than standard fuel, as that term is defined in Appendix E, the Purchaser shall obtain delivery and procedure confirmation from DOE prior to delivery. DOE shall advise Purchaser within sixty (60) days after receipt of such confirmation request as to the technical feasibility of disposing of such fuel on the currently agreed to schedule and any schedule adjustment for such services.

B. Acceptance Procedures

1. *Acceptance Priority Ranking.*

Delivery commitment schedules for SNF and/or HLW may require the disposal or more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate. The following acceptance priority ranking will be utilized:

(a) Except as may be provided for in subparagraph (b) below and Article V.D. of this contract, acceptance priority shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility, except as otherwise provided for in paragraphs B and D of Article V.

(b) Notwithstanding the age of the SNF and/or HLW, priority may be accorded any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason.

2. *Verification of SNF and/or HLW.*

During cask loading and prior to acceptance by DOE for transportation to the DOE facility, the SNF and/or HLW description of the shipping lot shall be subject to verification by DOE. To the extent the SNF and/or HLW is consistent with the description submitted and approved, in accordance with Appendices E and F, DOE agrees to accept such SNF and/or HLW for disposal when DOE has verified the SNF and/or HLW description, determined the material is properly loaded, packaged, marked, labeled and ready for transportation, and has taken custody, as evidenced in writing, of the material at the Purchaser's site, f.o.b. carrier. A properly executed off-site radioactive shipment record describing cask contents must be prepared by the Purchaser along with a signed certification which states: "This is to certify that the above-named materials are properly described, classified, packaged, marked and labeled and are in proper condition for transfer according to the applicable regulations of the U. S. Department of Transportation."

3. *Improperly described SNF and/or HLW.*

(a) *Prior to Acceptance* — If SNF and/or HLW is determined by DOE to be improperly described prior to acceptance by DOE at the Purchaser's site, DOE shall promptly notify the Purchaser in writing of such determination. DOE reserves the right, in its sole discretion, to refuse to accept such SNF and/or HLW until the SNF and/or HLW has been properly described. The Purchaser shall not transfer such SNF and/or HLW to DOE unless DOE agrees to accept such SNF and/or HLW under such other arrangements as may be agreed to, in writing, by the parties.

(b) *After Acceptance* — If subsequent to its acceptance DOE finds that such SNF and/or HLW is improperly described, DOE shall promptly notify the Purchaser, in writing, of such finding. In the event of such notification, Purchaser shall provide DOE with a proper designation within thirty (30) days. In the event of a failure by the Purchaser to provide such proper designation, DOE may hold in abeyance any and all deliveries scheduled hereunder.

Article VII — Title

Title to all SNF and/or HLW accepted by DOE for disposal shall pass to DOE at the Purchaser's site as provided for in Article VI hereof. DOE shall be solely repsonsible for control of all material upon passage of title. DOE shall have the right to dispose as it sees fit of any SNF and/or HLW to which it has taken title. The Purchaser shall have no claim against DOE or the Government with respect to such SNF or HLW nor shall DOE or the Government be obligated to compensate the Purchaser for such material.

Article VIII — Fees and Terms of Payment

A. Fees

1. Effective April 7, 1983 Purchaser shall be charged a fee in the amount of 1.0 mill per kilowatt-hour (1M/KWH) on electricity generated by Purchaser's nuclear power reactor(s). The said fee shall be paid as specified in paragraph B of this Article VIII.

2. For SNF, or solidified high-level radioactive waste derived from SNF, which fuel was used to generate electricity in a civilian nuclear power reactor prior to April 7, 1983, a one-time fee will be assessed by applying industry-wide average dollar per kilogram charges to four (4) distinct ranges of fuel burnup so that the integrated cost across all discharged (i.e. spent) fuel is equivalent to an industry-wide average charge of 1.0 mill per kilowatt-hour. For purposes of this contract, discharged nuclear fuel is that fuel removed from the reactor core with no plans for reinsertion. In the event that any such fuel withdrawn with plans for reinsertion is not reinserted, then the applicable fee for such fuel shall be calculated as set forth in this paragraph 2. The categories of spent nuclear fuel burnup and the fee schedule are listed below:

[In 1982 dollars]

| Nuclear spent fuel burnup range | Dollars per kilogram |
|---|---|
| 0 to 5,000 MWDT/MTU | $80.00 |
| 5,000 to 10,000 MWDT/MTU | 142.00 |
| 10,000 to 20,000 MWDT/MTU | 162.00 |
| Over 20,000 MWDT/MTU | 184.00 |

This fee shall not be subject to adjustment, and the payment thereof by the Purchaser shall be made to DOE as specified in paragraph B of this Article VIII.

3. For in-core fuel as of April 7, 1983, that portion of the fuel burned through April 6, 1983 shall be subject to the one-time fee as calculated in accordance with the following methodology: [a] determine the total weight in kilograms of unranium loaded initially in the particular core; [b] determine the total megawatt-days (thermal) which have been generated by all of the fuel assemblies in the said core as of 12:00 A.M. April 7, 1983; [c] divide the megawatt-days (thermal) generated in the said core by the total metric tons of initially loaded uranium in that core and multiply the quotient by the conversion factor 0.0078 to obtain a value in dollars per kilogram; and [d] multiply the dollars per kilogram value by the kilograms determined in [a] above to derive the dollar charge for the one-time fee to be paid for the specified in-core fuel as of 12:00 A.M. April 7, 1983. For purposes of this contract, in-core fuel is that fuel in the reactor core as of the date specified, plus any fuel removed from the reactor with plans for reinsertion. That portion of such fuel unburned as of 12:00 A.M. April 7, 1983 shall be subject to the 1.0 mill per kilowatt-hour charge.

4. DOE will annually review the adequacy of the fees and adjust the 1M/KWH fee, if necessary, in order to assure full cost recovery by the Government. Any proposed adjustment to the said fee will be transmitted to Congress and shall be effective after a period of ninety (90) days of continuous session has elapsed following receipt of such transmittal unless either House of Congress adopts a resolution disapproving the proposed adjustment. Any adjustment to the 1M/KWH fee under paragraph A.1. of this Article VIII shall be prospective.

B. Payment

1. For electricity generated by the Purchaser's civilian nuclear power reactor(s) on or after April 7, 1983, fees shall be paid quarterly by the Purchaser and must be received by DOE not later than the close of business on the last business day of the month following the end of each assigned three month period. The first payment shall be due on July 31, 1983, for the period April 7, 1983 to June 30, 1983. [add as applicable: A one time adjustment period payment shall be due on — — — —, for the period — — — — to — — — — ]. The assigned three month period, for purposes of payment and reporting of kilowatt hours, shall begin — — — — .

2. For SNF discharged prior to April 7, 1983, and for in-core burned fuel as of 12:00 A.M. April 7, 1983, the Purchaser shall, within two (2) years of contract execution, select one of the following fee payment options:

(a) *Option 1* — The Purchaser's financial obligation for said fuel shall be prorated evenly over forty (40) quarters and will consist of the fee plus interest on the outstanding fee balance. The interest from April 7, 1983, to date of the first

payment is to be calculated based upon the 13-week Treasury bill rate, as reported on the first such issuance following April 7, 1983, and compounded quarterly thereafter by the 13-week Treasury bill rates as reported on the first such issuance of each succeeding assigned three-month period. Beginning with the first payment, interest is to be calculated on Purchaser's financial obligation plus accrued interest, at the ten-year Treasury note rate in effect on the date of the first payment. In no event shall the end of the forty (40) quarters extend beyond the first scheduled delivery date as reflected in the DOE-approved delivery commitment schedule. All payments shall be made concurrently with the assigned three month period payments. At any time prior to the end of the forty (40) quarters, Purchaser may, without penalty, make a full or partial lump sum payment at any of the assigned three month period payment dates. Subsequent quarterly payments will be appropriately reduced to reflect the reduction in the remaining balance in the fee due and payable. The remaining financial obligation, if any, will be subject to interest at the same ten-year Treasury note rate over the remainder of the ten year period.

(b) *Option 2* — The Purchaser's financial obligation shall be paid in the form of a single payment anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule, and shall consist of the fee plus interest on the outstanding fee balance. Interest is to be calculated from April 7, 1983, to the date of the payment based upon the 13-week Treasury bill rate, as reported on the first such issuance following April 7, 1983, and compounded quarterly thereafter by the 13-week Treasury bill rates as reported on the first such issuance of each succeeding assigned three-month period until payment.

(c) *Option 3* — The Purchaser's financial obligation shall be paid prior to June 30, 1985, or prior to two (2) years after contract execution, whichever comes later, in the form of a single payment and shall consist of all outstanding fees for SNF and in-core fuel burned prior to April 7, 1983. Under this option, no interest shall be due to DOE from April 7, 1983, to the date of full payment on the outstanding fee balance.

3. *Method of Payment:*

(a) Payments shall be made by wire transfer, in accordance with instructions specified by DOE in Appendix G, annexed hereto and made a part hereof, and must be received within the time periods specified in paragraph B.1. of this Article VIII.

(b) The Purchaser will complete a Standard Remittance Advice, as set forth in Appendix G, for each assigned three month period payment, and mail it postmarked no later than the last business day of the month following each assigned three month period to Department of Energy, Office of Controller, Cash Management Division, Box 500, Room D-208, Germantown, Maryland 20874.

4. Any fees not paid on a timely basis or underpaid because of miscalculation will be subject to interest as specified in paragraph C of this Article VIII.

C. Interest on Late Fees

1. DOE will notify the Purchaser of amounts due only when unpaid or underpaid by the dates specified in paragraph B above. Interest will be levied according to the following formula:

Interest=Unpaid balance due to DOE for assigned three month period X Quarterly Treasury rate plus six percent (6%) X Number of months late including month of payment (fractions rounded up to whole months) / 12

2. Interest is payable at any time prior to the due date for the subsequent assigned three month period fee payment. Nonpayment by the end of the subsequent assigned three month period will result in compounding of interest due. Purchaser shall complete a Standard Remittance Advice of interest payments.

3. Following the assessment of a late fee by DOE, payments will be applied against accrued interest first and the principal thereafter.

D. Effect of Payment

Upon payment of all applicable fees, interest and penalties on upaid or underpaid amounts, the Purchaser shall have no further financial obligation to DOE for the disposal of the accepted SNF and/or HLW.

E. Audit

1. The DOE or its representative shall have the right to perform any audits or inspections necessary to determine whether Purchaser is paying the correct amount under the fee schedule and interest provisions set forth in paragraphs A, B and C above.

2. Nothing in this contract shall be deemed to preclude an audit by the General Accounting Office of any transaction under this contract.

3. The Purchaser shall furnish DOE with such records, reports and data as may be necessary for the determination of quantities delivered hereunder and for final settlement of amounts due under this contract and shall retain and make available to DOE and its authorized representative examination at all reasonable times such records, reports and data for a period of three (3) years from the completion of delivery of all material under this contract.

Article IX — Delays

A. Unavoidable Delays by Purchaser or DOE

Neither the Government nor the Purchaser shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform. In the event circumstances beyond the reasonable control of the Purchaser or DOE — such as acts of God, or of the public enemy, acts of Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes and unusually severe weather — cause delay in scheduled delivery, acceptance or transport of SNF and/or HLW, the party experiencing the delay will notify the other party as soon as possible after such delay is ascertained and the parties will readjust their schedules, as appropriate, to accommodate such delay.

B. Avoidable Delays by Purchaser or DOE

In the event of any delay in the delivery, acceptance or transport of SNF and/or HLW to or by DOE caused by circumstances within the reasonable control of either the Purchaser or DOE or their respective contractors or suppliers, the charges and schedules specified by this contract will be equitably adjusted to reflect any estimated additional costs incurred by the party not responsible for or contributing to the delay.

Article X — Suspension

A. In addition to any other rights DOE may have hereunder, DOE reserves the right, at no cost to the Government, to suspend this contract or any portion thereof upon written notice to the Purchaser within ninety (90) days of the Purchaser's failure to perform its obligations hereunder, and the Purchaser's failure to take corrective action within thirty (30) days after written notice of such failure to perform as provided above, unless such failure shall arise from causes beyond the control and without the fault or negligence of the Purchaser, its contractors or agents. However, the Purchaser's obligation to pay fees required hereunder shall continue unaffected by any suspension. Any such suspension shall be rescinded if and when DOE determines that Purchaser has completed corrective action.

B. The DOE reserves the right to suspend any scheduled deliveries in the event that a national emergency requires that priority be given to Government programs to the exclusion of the work under this contract. In the event of such a suspension by the Government, the DOE shall refund that portion of payments representing services not delivered as determined by the Contracting Officer to be an equitable adjustment. Any disagreement arising from the refund payment, if any, shall be resolved as provided in the clause of this contract, entitled "DISPUTES."

Article XI — Remedies

Nothing in this contract shall be construed to preclude either party from asserting its rights and remedies under the contract or at law.

Article XII — Notices

All notices and communications between the parties under this contract (except notices published in the Federal Register) shall be in writing and shall be sent to the following addressees:

To DOE:

—

—

To the Purchaser:

—

—

However, the parties may change the addresses or addressees for such notices or communications without formal modification to this contract; *provided, however,* that notice of such changes shall be given by registered mail.

Article XIII — Representation Concerning Nuclear Hazards Indemnity

A. DOE represents that it will include in its contract(s) for the operation of any DOE facility an indemnity agreement based upon Section 170(d) of the Atomic Energy Act of 1954, as amended, a copy of which agreement shall be furnished to the Purchaser; that under said agreement, DOE shall have agreed to indemnify the contractor and other persons indemnified against claims for public liability (as defined in said Act) arising out of or in connection with contractual activities; that the indemnity shall apply to covered nuclear incidents which (1) take place at a contract location; or (2) arise out of or in the course of transportation of source, special nuclear or by-product material to or from a contract location. The obligation of DOE to indemnify shall be subject to the conditions stated in the indemnity agreement.

B. The provisions of this Article XIII shall continue beyond the term of this contract.

Article XIV — Assignment

The rights and duties of the Purchaser may be assignable with transfer of title to the SNF and/or HLW involved; *provided, however,* that notice of any such transfer shall be made to DOE within ninety (90) days of transfer.

Article XV — Amendments

The provisions of this contract has been developed in the light of uncertainties necessarily attendant upon long-term contracts. Accordingly, at the request of either DOE or Purchaser, the parties will negotiate and, to the extent mutually agreed, amend this contract as the parties may deem to be necessary or proper to reflect their respective interests; *provided, however,* that any such amendment shall be consistent with the DOE final rule published in the Federal Register on April 18, 1983 entitled, "Standard Contract for Disposal or SNF and/or HLW", as the same may be amended from time to time.

Article XVI — Disputes

A. Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Purchaser. The decision of the Contracting Officer shall be final and conclusive unless within ninety (90) days from the date of receipt of such copy, the Purchaser mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the DOE Board of Contract Appeals (Board). The decision of the Board shall be final and conclusive unless determined by a court of competent jursidiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith or not supported by substantial evidence. In connection with any appeal proceeding under this clause, the Purchaser shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision.

B. For Purchaser claims of more than $50,000, the Purchaser shall submit with the claim a certification that the claim is made in good faith; the supporting data are accurate and complete to the best of the Purchaser's knowledge and belief; and the amount requested accurately reflects the contract adjustment for which the Purchaser believes the Government is liable. The certification shall be executed by the Purchaser if an individual. When the Purchaser is not an individual, the certification shall be executed by a senior company official in charge at the Purchaser's plant or location involved, or by an officer or general partner of the Purchaser having overall responsibility for the conduct of the Purchaser's affairs.

C. For Purchaser claims of $50,000 or less, the Contracting Officer must render a decision within sixty (60) days. For Purchaser claims in excess of $50,000, the Contracting Officer must decide the claim within sixty (60) days or notify the Purchaser of the date when the decision will be made.

D. This "Disputes" clause does not preclude consideration of law questions in connection with decisions provided for in paragraph A above; *provided, however,* that nothing in this contract shall be construed as making final the decision of any administrative official, representative, or board on a question of law.

Article XVII — Officials Not To Benefit

No member of or delegate to Congress or resident commissioner shall be admitted to any share or part of this contract, or to any benefit that may arise therefrom, but this provision shall not be construed to extend to this contract if made with a corporation for its general benefit.

Article XVIII — Covenant Against Contingent Fees

The Purchaser warrants that no person or selling agency has been employed or retained to solicit or secure this contract upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Purchaser for the purpose of securing business. For breach or violation of this warranty, the Government shall have the right to annul this contract without liability or in its discretion to increase the contract price or consideration, or otherwise recover, the full amount of such commission, brokerage, or contingent fee.

Article XIX — Examination of Records

The Purchaser agrees that the Comptroller General of the United States or any of his duly authorized representatives shall have access to and the right to examine any directly pertinent books, documents, papers and records of the Purchaser involving transactions related to this contract until the expiration of three years after final payment under this contract.

Article XX — Permits

The Government and the Purchaser shall procure all necessary permits or licenses (including any special nuclear material licenses) and comply with all applicable laws and regulations of the United States, States and municipalities necessary to execute their respective responsibilities and obligations under this contract.

Article XXI — Rights in Technical Data

A. Definitions.

1. "Technical data" means recorded information regardless of form or characteristic, of a specific or technical nature. It may, for example, document research, experimental, developmental, or demonstration, or engineering work, or be usable or used to define a design or process, or to procure, produce, support, maintain or operate material. The data may be graphic or pictorial delineations in media such as drawings or photographs, text in specifications or related performance or design-type documents or computer software (including computer programs, computer software data bases, and computer software documentation). Examples of technical data include research and engineering data, engineering drawings and associated lists, specifications, standards, process sheets, manuals, technical reports, catalog item identification, and related information. Technical data as used herein do not include financial reports, cost analyses, and other information incidental to contract administration.

2. "Proprietary data" means technical data which embody trade secrets developed at private expense, such as design procedures or techniques, chemical composition of materials, or manufacturing methods, processes, or treatments, including minor modifications thereof, provided that such data:

(a) Are not generally known or available from other sources without obligation concerning their confidentiality;

(b) Have not been made available by the owner to others without obligation concerning its confidentiality; and

(c) Are not already available to the Government without obligation concerning their confidentiality.

3. "Contract data" means technical data first produced in the performance of the contract, technical data which are specified to be delivered under the contract, or technical data actually delivered in connection with the contract.

4. "Unlimited rights" means rights to use, duplicate, or disclose technical data, in whole or in part, in any manner and for any purpose whatsoever, and to permit others to do so.

B. Allocation of Rights.

1. The Government shall have:

(a) Unlimited rights in contract data except as otherwise provided below with respect to proprietary data properly marked as authorized by this clause;

(b) The right to remove, cancel, correct or ignore any marking not authorized by the terms of this contract on any technical data furnished hereunder, if in response to a written inquiry by DOE concerning the proprietary nature of the markings, the Purchaser fails to respond thereto within 60 days or fails to substantiate the proprietary nature of the markings. In either case, DOE will notify the Purchaser of the action taken;

(c) No rights under this contract in any technical data which are not contract data.

2. Subject to the foregoing provisions of this rights in technical data clause, the Purchaser shall have the right to mark proprietary data it furnishes under the contract with the following legend and no other, the terms of which shall be binding on the Government:

Limited Rights Legend

This "proprietary data," furnished under "Contract No. — — " with the U.S. Department of Energy may be duplicated and used by the Government with the express limitations that the "proprietary data" may not be disclosed outside the Government or be used for purposes of manufacture without prior permission of the Purchaser, except that further disclosure or use may be made solely for the following purposes:

(a) This "proprietary data" may be disclosed for evaluation purposes under the restriction that the "proprietary data" be retained in confidence and not be further disclosed;

(b) This "proprietary data" may be disclosed to contractors participating in the Government's program of which this contract is a part, for information or use in connection with the work performed under their contracts and under the restriction that the "proprietary data" be retained in confidence and not be further disclosed; or

(c) This "proprietary data" may be used by the Government or others on its behalf for emergency work under the restriction that the "proprietary data" be retained in confidence and not be further disclosed. This legend shall be marked on any reproduction of this data in whole or in part.

3. In the event that proprietary data of a third party, with respect to which the Purchaser is subject to restrictions on use or disclosure, is furnished with the Limited Rights Legend above, Purchaser shall secure the agreement of such third party to the rights of the Government as set forth in the Limited Rights Legend. DOE shall upon request furnish the names of those contractors to which proprietary data has been disclosed.

Article XXII — Entire Contract

A. This contract, which consists of Articles I through XXII and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

B. Nothing in this contract is intended to affect in any way the contractual obligation of any other persons with whom the Purchaser may have contracted with respect to assuming some or all disposal costs or to accept title to SNF and/or HLW.

C. Appendices

A. Nuclear Power Reactor(s) or Other Facilities Covered

B. Discharge Information (Ten Year; Annual)

C. Delivery Commitment Schedule

D. Final Delivery Schedule

E. General Specifications

F. Detailed Description of Purchaser's Fuel

G. Standard Remittance Advice

In witness whereof, the parties hereto have executed this contract as of the day and year first above written.

United States of America

United States Department of Energy

By:

(Contracting Officer)

Witnesses as to Execution on Behalf of Purchaser

(Name)

(Address)

(Name)

(Address)

(Purchaser's Company Name)

By:

Title:

I, (*Name* ), certify that I am the (*Title* ) of the corporation named as Purchaser herein; that (*Name* ) who signed this document on behalf of the Purchaser was then (*Title* ) of said corporation; that said document was duly signed for and on behalf of said corporation by authority of its governing body and is within the scope of its corporate powers.

In Witness Whereof, I have hereunto affixed my hand and the seal of said corporation this — — day of — —, 1983

(Corporate Seal)

(Signature)

Appendix A

Nuclear Power Reactor(s) or Other Facilities Covered

Purchaser

Contract Number/Date — — / — —

Reactor/Facility Name

Location:

Street

City

County/State — — — — /

Zip Code

Capacity (MWE) — Gross

Reactor Type:

BWR square

PWR square

Other (Identify)

Facility Description

Date of Commencement of Operation

(actual or estimated)

NRC License #:

By Purchaser:

Signatue

Title

Date

Appendix B

Ten Year Discharge Forecast

To be used for DOE planning purposes only and does not represent a firm commitment by Purchaser.

Purchaser

Contract Number/Date — — — — /

Reactor/Facility Name

Location:

Street

City

County/State — — — — /

Zip Code

Type: BWR square

PWR square

Other (Identify)

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 10 yr total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Discharge date--mo/yr (or refueling shut down date) | | | | | | | | | | | |
| Metric tons: | | | | | | | | | | | |
| --initial | | | | | | | | | | | |
| --discharged | | | | | | | | | | | |
| Number of assemblies discharged (per cycle) | | | | | | | | | | | |

By Purchaser:

Signature

Title

Date

Appendix B (Enclosure 1)

Actual Discharges

Purchaser

Contract Number/Date

Reactor/Facility Name

Location:

Street

City

County/State

Zip Code

Type:

BWR square

PWR square

Other (Identify)

Refueling Shutdown Date

Metric Tons Uranium (Initial/Discharged);

Initial

Discharged

Number of Assemblies Discharged:

Any false, fictitious or fraudulent statement may be punishable by fine or imprisonment (U.S. Code, Title 18, Section 1001).

By Purchaser:

Signature

Title

Date

Appendix C

Delivery Commitment Schedule

This delivery commitment schedule shall be submitted by Purchaser to DOE as specified in Article V.B. of this contract.

Purchaser

Contract Number/Date

Reactor/Facility Name

Location:

Street

City

County/State

Zip Code

Type Cask Required:

Shipping Lot Number

(Assigned by DOE)

Proposed Shipping Mode:

Truck square

Rail square

Barge square

DOE Assigned Delivery Commitment Date

Range of Discharge Date(s) (Earliest to Latest)

Mo — — Day — — Yr — — to Mo — — Day — — Yr — —

Metric Tons Uranium:

(Initial)

(Discharged)

Number of Assemblies:

BWR

PWR

Other

Unless otherwise agreed to in writing by DOE, the Purchaser shall furnish herewith to DOE suitable proof of ownership of the SNF and/or HLW to be delivered hereunder. The Purchaser shall notify DOE in writing at the earliest practicable date of any change in said ownership.

Any false, fictitious or fraudulent statement may be punishable by fine or imprisonment (U.S. Code, Title 18, Section 1001).

By Purchaser:

Signature

Title

Date

Approved by DOE:

Technical Representative

Title

Date

Contracting Officer

Date

Appendix D

Final Delivery Schedule

(To be submitted to DOE by Purchaser for each designated Purchaser Delivery site not later than twelve (12) months prior to estimated date of first delivery)

Purchaser:

Contract Number/Date

Reactor/Facility Name

Location:

Street

City

County/State

Zip Code

Type(s) cask(s) required:

No. Assembilies per cask

Shipping Lot Number

Shipping Mode:

(Assigned by DOE)

Truck

Rail

Barge

Metric Tons Uranium:

(Initial)

(Discharged)

Range of Discharge Date(s) (Earliest to Latest)

(From approved commitment schedule)

Mo — — Day — — Yr — — to Mo — — Day — — Yr — —

Number of Assemblies:

BWR

PWR

Other

Purchaser's Delivery First Estimate

Mo — — Day — — Yr — — last Mo — — Day — — Mo — —

Unless otherwise agreed to in writing by DOE, the Purchaser shall furnish herewith to DOE suitable proof of ownership of the SNF and/or HLW to be delivered hereunder. The Purchaser shall notify DOE in writing at the earliest practicable date of any change in said ownership.

To confirm acceptability of delivery date(s):

Purchaser Contact

Phone

Title

DOE Contact

Phone

Title

Any false, fictitious or fraudulent statement may be punishable by fine or imprisonment (U.S. Code, Title 18, Section 1001).

48 FR 16590

By Purchaser:

Signature

Title

Date

Approved by DOE:

Technical Representative

Title

Date

Contracting Officer

Date

Appendix E

General Specifications

A. Fuel Category Identification

1. Categories — Purchaser shall use reasonable efforts, utilizing technology equivalent to and consistent with the commercial practice, to properly classify Spent Nuclear Fuel (SNF) prior to delivery to DOE, as follows:

a. "Standard Fuel" means SNF that meets all the General Specifications therefor set forth in paragraph B below.

b. "Nonstandard Fuel" means SNF that does not meet one or more of the General Specifications set forth in subparagraphs 1 through 5 of paragraph B below, and which is classified as Nonstandard Fuel Classes NS-1 through NS-5, pursuant to paragraph B below.

c. "Failed Fuel" means SNF that meets the specifications set forth in subparagraphs 1 through 3 of paragraph B below, and which is classified as Failed Fuel Class F-1 through F-3 pursuant to subparagraph 6 of paragraph B below.

d. Fuel may have "Failed Fuel" and/or several "Nonstandard Fuel" classifications

B. *Fuel Description and Subclassification — General Specifications*

1. *Maximum Nominal Physical Dimensions.*

| | Boiling water reactor (BWR) | Pressurized water reactor (PWR) |
|---|---|---|
| Overall Length | 14 feet, 11 inches | 14 feet, 10 inches. |
| Active Fuel Length | 12 feet, 6 inches | 12 feet, 0 inches. |
| Cross Section n1 | 6 inches X 6 inches | 9 inches X 9 inches. |

n1 The cross section of the fuel assembly shall not include the channel.

Note. — Fuel that does not meet these specifications shall be classified as Nonstandard Fuel — Class NS-1.

2. *Nonfuel Components.* Nonfuel components including, but not limited to, control spiders, burnable poison rod assemblies, control rod elements, thimble plugs, fission chambers, and primary and secondary neutron sources, that are contained within the fuel assembly, or BWR channels that are an integral part of the fuel assembly, which do not require special handling, may be included as part of the spent nuclear fuel delivered for disposal pursuant to this contract.

Note. — Fuel that does not meet these specifications shall be classified as Nonstandard Fuel — Class NS-2.

3. *Cooling.* The minimum cooling time for fuel is five (5) years.

Note. — Fuel that does not meet this specification shall be classified as Nonstandard Fuel — Class NS-3.

4. *Non-LWR Fuel.* Fuel from other than LWR power facilities shall be classified as Nonstandard Fuel — Class NS-4. Such fuel may be unique and require special handling, storage, and disposal facilities.

5. *Consolidated Fuel Rods.* Fuel which has been disassembled and stored with the fuel rods in a consolidated manner shall be classified as Nonstandard Fuel Class NS-5.

6. *Failed Fuel.*

a. Visual Inspection.

Assemblies shall be visually inspected for evidence of structural deformity or damage to cladding or spacers which may require special handling. Assemblies which [i] are structurally deformed or have damaged cladding to the extent that special handling may be required or [ii] for any reason cannot be handled with normal fuel handling equipment shall be classified as Failed Fuel — Class F-1.

b. Previously Encapsulated Assemblies.

Assemblies encapsulated by Purchaser prior to classification hereunder shall be classified as Failed Fuel — Class F-3. Purchaser shall advise DOE of the reason for the prior encapsulation of assemblies in sufficient detail so that DOE may plan for appropriate subsequent handling.

c. Regulatory Requirements.

Spent fuel assemblies shall be packaged and placed in casks so that all applicable regulatory requirements are met.

C. Summary of Fuel Classifications

1. *Standard Fuel:*

a. Class S-1: PWR

b. Class S-2: BWR

2. *Nonstandard Fuel:*

a. Class NS-1: Physical Dimensions

b. Class NS-2: Non Fuel Components

c. Class NS-3: Short Cooled

d. Class NS-4: Non-LWR

e. Class NS-5: Consolidated Fuel Rods.

3. *Failed Fuel:*

a. Class F-1: Visual Failure or Damage

b. Class F-2: Radioactive "Leakage"

c. Class F-3: Encapsulated

D. High-Level Radioactive Waste

The DOE shall accept high-level radioactive waste. Detailed acceptance criteria and general specifications for such waste will be issued by the DOE no later than the date on which DOE submits its license application to the Nuclear Regulatory Commission for the first disposal facility.

Appendix F

Detailed Description of Purchaser's Fuel

This information shall be provided by Purchaser for each distinct fuel type within a Shipping Lot not later than sixty (60) days prior to the schedule transportation date.

48 FR 16590

Purchaser

Contract Number/Date — — / — — — —

Reactor/Facility Name —

—

—

I. Drawings included in generic dossier: — — — —

1. Fuel Assembly DWG# — —

2. Upper & Lower end fittings DWG# — —

Dossier Number: — —

DOE Shipping Lot #: — —

# Assemblies Described:

— — — BWR

— — — PWR

— — — Other

II. *Design Material Descriptions.*

*Fuel Element:*

1. Element type — — (rod, plate, etc.)

2. Total length) — — /(in.)

3. Active length — — (in.)

4. Cladding material — — (Zr, s.s., etc.)

*Assembly Description:*

1. Number of Elements — —

2. Overall dimensions (length — — (cross section) — — (in.)

3. Overall weight — —

III. Describe any distortions, cladding damage or other damage to the spent fuel, or nonfuel components within this Shipping Lot which will require special handling procedures. (Attach additional pages if needed.)

—

—

IV. Assembly Number — —

Shipping Lot # — —

48 FR 16590

| | Irradiation history cycle No. 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| 1. Startup date (mo/day/yr) | | | | | |
| 2. Shutdown date (mo/day/yr) | | | | | |
| 3. Cumulative fuel exposure (mwd/mtu) | | | | | |
| 4. Avg. reactor power (mwth) | | | | | |

5. Total heat output/assembly in watts, using an approved calculational method:--------as of Date--------

Any false, fictitious or fradulent statement may be punishable by fine or imprisonment (U.S. Code, Title 18, Section 1001).

By Purchaser:

Signature

Title

Date

Appendix G

Standard Remittance of Advice (RA) for Payment of Fees

Assigned Three-Month Period Covered: from — — — to — — —

I. A. Purchaser (Utility name and address):

—

—

B. Contract Number — — — —

II. Payment for Spent Nuclear Fuel — $ — —

A. Financial Obligation as of April 7, 1983 — — — —

B. Financial Obligation as of Date of First/Single Payment — — — —

C. Date of First/Single Payment — — — —

D. Unpaid Balance to Date — — — —

E. Date of This Payment — — — —

F. Ten Year Treasury Note Rate — — — —

III. Payment for M/KWH Fee — $ — —

A. Total Nuclear KWH Generated During Assigned Three Month Period Covered — — — —

B. Date of This Payment — — — —

C. M/KWH Fee Schedule Rate — — — —

IV. Underpayment (as notified by DOE)

A. Date of Notification

B. DOE Invoice Number

C. Interest Paid

V. Late payments (as notified by DOE)

A. Date of Notification

B. DOE Invoice Number

C. Interest Paid

VI. Other Credits Claimed (Explain $( )

VII. *Total Remittance* $ — — —

Prepared by:

Title:

Phone Number:

Date:

Any false, fictitious or fraudulent statement may be punishable by fine or imprisonment (U.S. Code, Title 18, Section 1001.)

By Purchaser:

—

Signature Title Date

—

FOR DOE USE ONLY THIS LINE

—

1. Deposit to Account 89-5227

2. Receip of Payment Verification

a. Date Payment Received

b. Verification Performed by

3. Posted to Cumulative Remitter Ledger:

a. Date Posted

b. Posted by

4. Late Payments:

a. Calculation of late charge (attach schedule)

—

b. Billing date

5. After processing RA furnish copy to OCRWM

Instructions for Completing DOE Remittance Advice

Upon completion, this form must be mailed on the last workday of the month following each assigned three-month period.

Section I:

Name & Address (self explanatory)

Contract Number will be the identification number assigned by DOE upon execution.

Section II:

Based upon permanently discharged inventory of spent fuel and HLW amassed prior to April 7, 1983, and that portion of the in-core fuel burned through April 6, 1983. Under either payment option 1 or 2, interest will accrue and be compounded at 13-week Treasury bill rates until the first/single payment is made. If the 10 year option is selected, purchaser's financial obligation will be paid in level payment of principal and interest over the first payment. Payments will be made in quarterly installments concurrently with the normal three month assigned period. If option 2 is selected, purchaser will liquidate its total financial obligation, consisting of the fee plus accrued interest, in the form of a single payment. If option 3 is selected, no interest will accrue and lines A and E only must be filled out. This section of the Remittance Advice should be completed for each payment under the 10 year option and only once with either single payment option. (See Annex B, to be completed only once.)

a. Self explanatory

b. Fee obligation plus accrued interest

c. Self explanatory

d. Self explanatory

f. Ten year Treasury Note rate in effect at first/single payment

$Amount paid

Section III:

Based upon electricity generated on or after April 7, 1983, a schedule should be attached specifying the gross power generated by each plant during the assigned three-month period as measured at the out put terminals of the turbine generator. (See Annex A, to be completed with each submission of the remittance advice.)

a. Total of power generation from attached schedules

b. Self explanatory

c. Fee schedule rate in effect at time of payment

Sections IV & V:

(Same instructions as above) DOE will invoice purchasers when underpayments or late payments occur, reference a particular payment, and state the reason for the invoice.

A. The date the purchaser received DOE invoice

B. DOE's invoice #

C. Interest paid

$. Consists of interest if late payment or fees plus interest if under payment

Section VI:

Explain on an attached sheet of paper, if necessary, why DOE has been overpaid and the proposed disposition of the payment, e.g., apply credit against this payment or send refund.

$If applied against this payment, this number is negative. If refund desired, leave blank and pay gross amount due from Sections II through V.

Section VII:

The sum of Sections II through VI.

Instruction Guide for Remittance of Nuclear Waste Disposal Fee to Department of Energy Via Wire Transfer

Payments made to the Department of Energy (DOE) for Nuclear Waste Disposal Fees will be affected by the

Purchaser's commercial bank via the Federal Reserve Communications System (also known as Fedwire) to the Department of Treasury. If the Purchaser's commercial bank is not a Federal Reserve member, then the Purchaser's bank will use a correspondent member bank to effect the transfer of funds.

Purchaser must provide specific information to its bank so that the transfer of funds can take place. Failure to correctly provide the information could result in delay crediting of the remittance to DOE and could subject the purchaser to late charges.

If additional information is required, contact DOE representatives, Mark Loop or Joe Startari, on (301) 353-4899 or 353-5857).

Annex A to Appendix G

Standard Remittance of Advice (RA) for Payment of Fees

This Annex should be completed to compute the MKWH fee for SNF burned on or after April 7, 1983.

I. *Identification*

A. Purchaser: — — — — — —

B. *Period Covered*

| | Last report | This report | Next report |
|---|---|---|---|
| 1. Date submitted: | | | |
| 2. Period covered: Start date: | | | |
| Finish date: | | | |
| 3. Length of period covered (days): | | | |

C. Unit Identification (Only one unit may be covered in each report.)

1. Reactor/Facility Name:

2. Location:

3. Type:

4. Capacity:

5. Date of Commencement of Operations:

6. NRC License No.:

II. *Fee Calculation*

| | Prior period | This period |
|---|---|---|
| 1. Gross Thermal Energy produced (MWH) | | |
| 2. Gross Electrical Energy produced (MWH) | | |
| 3. Gross Thermal Energy not used to generate electrical output (MWH) | | |
| 4. Gross electrical equivalent of thermal electricity (MWH) | | |
| 5. Net electrical energy produced (MWH) | | |
| 6. Electricity consumed/lost on site (MWH) | | |
| 7. Current fee rate:----mill/kWh | | |
| 8. Current fee due: | | |

Prepared by:

Phone number:

Date:

Annex B to Appendix G

Standard Remittance of Advice (RA) for Payment of Fees

This Annex should be completed only for SNF burned before midnight between April 6/7, 1983.

I. *Identification*

A. Purchaser: — — — — — —

B. Unit identification (Only one unit may be covered in each report.)

1. Reactor/Facility Name:

2. Location:

3. Type:

4. Capacity:

5. Date of Commencement of Operations:

6. NRC License No.:

II. *Fee Calculation*

A. *Discharged nuclear fuel*

| | | | | |
|---|---|---|---|---|
| 1. burnup n1 (MWDT/MTU) | 0-5,000 | 5,000-10,000 | 10,000 20,000 | 20,000 up |
| 2. initial loading (KgU) (with indicated burnup) | | | | |
| 3. fee rate ($/KgU) | 80.00 | 142.00 | 162.00 | 184.00 |
| 4. fee ($ ) | | | | |
| 5. total fee (4) | | | | |

B. Nuclear fuel in the reactor core as of midnight of 6/7 April 1983.

| Assembly identification | Initial loading (KgU) | Burnup n1 as of midnight 6/7 April 1983 (MWDT/MTU) | Fee |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |
| 6. | | | |
| 7. | | | |
| 8. | | | |
| 9. | | | |

| Assembly identification | Initial loading (KgU) | Burnup n1 as of midnight 6/7 April 1983 (MWDT/MTU) | Fee |
|---|---|---|---|
| 10. | | | |
| 11. | | | |
| 12. | | | |
| 13. | | | |
| 14. | | | |
| 15. | | | |
| 16. | | | |
| 17. | | | |
| 18. | | | |
| 19. | | | |
| 20. | | | |
| 21. | | | |
| 22. | | | |
| 23. | | | |
| 24. | | | |
| 25. | | | |

n1 Please provide (as an attachment) a clear reference to the methodology used to derive the burnup figures (computer codes, etc.) and a clear reference to all data used in the derivation of those figures.

C. Total fee.

[FR Doc. 83-10078 Filed 4-13-83; 11:50 am]

BILLING CODE 6450-01-M

107M50

********** Print Completed **********

Time of Request: December 09, 2004 12:51 PM EST

Print Number: 1842:23431160
Number of Lines: 1301
Number of Pages: 43

Send To: SMILEY, KEITH
DICKSTEIN SHAPIRO MORIN & OSHINSKY
2101 L ST NW
WASHINGTON, DC 20037-1526

107M50

Print Request: LEXSEE

Time of Request: December 09, 2004 12:55 PM EST

Number of Lines: 816
Job Number: 1842:23431650

Client ID/Project Name: 196780.0000.smile.case

Research Information:

Lexsee 48 FR 5458

Send to: SMILEY, KEITH
DICKSTEIN SHAPIRO MORIN & OSHINSKY
2101 L ST NW
WASHINGTON, DC 20037-1526